Ramsay Health Care, Inc., formerly known as Healthcare Services of America, Inc. (hereinafter referred to as "HSA"), appeals from an $800,000 judgment entered on a jury verdict in favor of Fred C. Follmer on his fraud claim. Because there was sufficient evidence to support the jury's verdict, and because we find no basis for reversal on any issues here presented, we affirm.
Follmer, a licensed certified public accountant, has worked as an executive officer in the hospital financial field for several years. For seven years, he was employed by Charter Medical Corporation, a hospital holding company, as vice president of financial operations. In 1985, Charter changed its management and Follmer resigned; however, pursuant to an employment agreement with Charter, Follmer continued to receive his salary and employment benefits until he procured another job. In his last year at Charter, Follmer made approximately $600,000 in salary, bonuses, and the sale of stock acquired through purchase options. Thereafter, Follmer was employed by a small hospital holding company, which, together with a group of investment bankers, he attempted *Page 747 
to acquire. When the acquisition did not materialize, Follmer resigned, and he was subsequently hired by HSA.
HSA was a publicly held corporation that owned 20 hospitals across the country specializing in psychiatric and chemical dependency healthcare. Its corporate headquarters were located in Birmingham.
In January 1987, Bill Miller and Associates, an employment agency specializing in recruiting executives, acting on behalf of HSA, contacted Follmer regarding the position of "Chief Financial Officer of Hospital Operations." On February 5, 1987, Follmer traveled to Birmingham and met with Charles Speir, the chairman of the board and chief executive officer of HSA, to discuss the position. On February 12, he again traveled to Birmingham, where he met with Tom Rodgers, the president and chief financial officer of HSA, to further discuss the position.
As a result of these interviews, Follmer accepted the job as HSA's "Chief Financial Officer of Hospital Operations." Follmer's compensation package consisted of an annual salary of $175,000, plus benefits. These benefits included purchase options on 100,000 shares of HSA stock; an incentive bonus amounting to 25% of his base compensation, which was to be "determined quarterly" on "mutually agreeable performance criteria"; and a "Merger/Termination Agreement," which provided for the payment of one year's salary and benefits in the event of a sale or change in control of the company, with no provision for termination benefits if he was discharged by HSA before its sale or change in control of the company. Follmer began employment at HSA on February 23, 1987. The "Merger/Termination Agreement" was not executed until May 7, 1987. No other employment agreements were executed.
Although Follmer's superiors at HSA were very pleased with his performance, his employment was terminated without advance notice on June 23, 1987. When he inquired as to why he was so suddenly discharged, HSA responded that it was due to "economic necessity." Follmer never received the bonus, nor the purchase option on the 100,000 shares of HSA stock that had been promised to him.[1] HSA offered Follmer three months' severance pay totaling approximately $47,000 in exchange for his executing a release waiving any rights or claims that he may have had against HSA. Follmer refused the severance pay offer, contending that he was entitled to one year's salary plus maintenance of benefits.
Upon HSA's refusal to honor his demands, Follmer sued HSA, alleging breach of contract and fraud in the inducement.
Follmer alleged in his fraud claim that HSA had made misrepresentations regarding termination benefits, stock options, and a bonus and that as a result he had been induced to accept employment at HSA and was thereby defrauded when HSA failed to honor its representations. He further alleged that HSA, when it made the misrepresentations, intended not to honor them. Follmer argued at trial, as he does on appeal, that he was promised termination benefits, not only upon a sale or change in control of the company, but when his employment at HSA was terminated for any reason.
In summary, Follmer contended that HSA had promised him that, upon his discharge, he would be eligible to receive termination benefits of one year's salary plus maintenance of all benefits as security for accepting short-term employment. He acknowledged receipt of the "Merger/Termination Agreement," and acknowledged the fact that benefits would not be payable thereunder unless his employment at HSA was terminated due to a sale or change in control of the company. Follmer argued, however, that in accordance with the representations made to him by HSA, he was expecting to receive another agreement that provided for the benefits to which he claimed that he was entitled. HSA denied *Page 748 
Follmer's contentions and argued that he was promised a "golden parachute," which, it argued, is defined in the accounting and tax field as a merger-termination agreement. HSA argued that Follmer got what he was promised, and that there were no misrepresentations made to him; rather, it argues, there was no "meeting of the minds" in regard to what was encompassed within a "golden parachute."
The case was tried before a jury, which returned a verdict in the amount of $800,000 in favor of Follmer on his fraud claim. The trial court overruled HSA's motion for JNOV pursuant to Rule 50, A.R.Civ.P., and its motion for a new trial pursuant to Rule 59, A.R.Civ.P. HSA appeals.
HSA contends that the trial court erred in allowing Follmer to present parol evidence regarding termination benefits, because, says HSA, any such representations were superseded by a written offer of employment that did not provide for the termination benefits that Follmer claims he was entitled to receive. See Appendix. We disagree. As a general proposition, the parol evidence rule applies to contract actions, not actions in tort. Parol evidence is ordinarily admissible to show that a written agreement was procured by fraud. Hall v.Integon Life Insurance Co., 454 So.2d 1338 (Ala. 1984), CurryMotor Co. v. Hasty, 505 So.2d 347 (Ala. 1987). This is exactly what Follmer alleged in his complaint, which, in pertinent part, states:
 "The representation made on behalf of HSAI to Follmer of the material facts as to his compensation were false representations made willfully to deceive Follmer with intent to induce him to alter his position to his risk in that those material facts were represented by HSAI with no intention of performing them."
Follmer's complaint did contain multiple claims, including a claim for breach of contract; however, the jury returned a verdict in Follmer's favor solely on his fraud claim. Therefore, we hold that the trial court did not err in admitting parol evidence of pre-employment negotiations.
HSA calls our attention to the case of Tyler v. EquitableLife Assurance Society of the United States, 512 So.2d 55, 57
(Ala. 1987), where it was held:
 "If a written contract exists, the rights of the parties are controlled by that contract; and parol evidence is not admissible to contradict, vary, add to, or subtract from its terms. Alabama Farm Bureau Mutual Casualty Insurance Company v. Adams, 289 Ala. 304, 267 So.2d 151 (1972). In addition, fraud or misrepresentation cannot be predicated upon a verbal statement made before execution of a written contract when a provision in that contract contradicts the verbal statement. Taylor v. Moorman Manufacturing Company, 475 So.2d 1187 (Ala. 1985). If a party has reason to doubt the truth of an oral representation or is informed of the truth before he acts, he may not reasonably act or rely on that representation. Bedwell Lumber Company v. T T Corporation, 386 So.2d 413 (Ala. 1980). Reliance is one of the elements that must be proven by a party charging fraud, and the reliance must be reasonable under the circumstances. Taylor v. Moorman Manufacturing Company, supra."
That holding, however, should not be interpreted to prohibit the introduction of parol evidence where the gravamen of the claim is that the defendant fraudulently induced the plaintiff to enter into the contract, i.e., that the contract was procured by fraud.
The context in which Tyler was written distinguishes that case from the instant case. In Tyler, as in Taylor v. MoormanManufacturing Co., 475 So.2d 1187 (Ala. 1985), the plaintiff sought relief based upon alleged oral misrepresentations that were clearly contradictory to the provisions of a subsequently executed agreement. The first sentence of the quoted language from Tyler addresses the "admissibility of parol evidence" issue in the context of a claim based on breach of contract. The remaining language from the Tyler quotation addresses the issue of reasonable reliance as a requisite element of legal fraud, where the plaintiff has reason to doubt the truth of the oral representation or is informed of the truth before he acts. *Page 749 
It has been generally held that, when a person signs a writing containing language that is clearly contrary to a pre-execution parol representation, reliance is unjustified. See, e.g., Kilpatrick v. Citibanc of Alabama/Andalusia,494 So.2d 39 (Ala. 1986); Tyler v. Equitable Life Assurance Societyof the United States, supra; Taylor v. Moorman Mfg. Co., supra; and Torres v. State Farm Fire Casualty Co.,438 So.2d 757 (Ala. 1983). For a statement of the standard by which "reasonable reliance" should be assessed, see Hickox v. Stover,551 So.2d 259 (Ala. 1989) (quoting from Chief Justice Hornsby's special concurrence in Southern States Ford, Inc. v. Proctor,541 So.2d 1081 (Ala. 1989)); see, also, A T T InformationSystems, Inc. v. Cobb Pontiac-Cadillac, Inc., 553 So.2d 529
(Ala. 1989); Leisure American Resorts, Inc. v. Knutilla,547 So.2d 424 (Ala. 1989); and Alpine Bay Resorts, Inc. v.Wyatt, 539 So.2d 160 (Ala. 1988).
We now turn to the issue whether there is sufficient evidence from which the jury could reasonably infer that Follmer was induced, through fraud and to his detriment, into accepting employment at HSA. The essential elements of a fraud claim are: (1) misrepresentation of a material fact; (2) made willfully to deceive, or recklessly without knowledge; (3) which was justifiably relied upon by the plaintiff under the circumstances; and (4) which caused damage as a proximate consequence. Bowman v. McElrath Poultry Co., 468 So.2d 879
(Ala. 1985).
Although there was conflicting testimony presented at trial, it is well settled that it is within the province of the jury to resolve conflicting evidence. After a thorough review of the record in this case, we conclude that there was substantial evidence upon which the jury could draw a well-founded inference that Follmer was induced by material misrepresentations into accepting employment at HSA.
The evidence indicates that HSA was in financial trouble. In 1986, its debt had risen from approximately $8,000,000 to over $150,000,000. HSA had a deficit cash flow, and it was in default on its loans. In January 1987, to deal with the problems that HSA was experiencing, a "90-day plan of action" was adopted by the board of directors, at the insistence of the lending institutions to which it was indebted. The plan's agenda included the stabilization of the company; the reduction of the executive staff of the Birmingham central office; and the creation of a new position of "Chief Financial Officer of Hospital Operations" ("CFOHO").
This new position was created to allow Rodgers (the Chief Financial Officer of HSA) to be relieved of the day-to-day financial duties at HSA, so that he could spend the necessary time required to locate a purchaser of the company. Consistent with this short-term plan of action, a "Senior Management Organization," composed of the new CFOHO, Speir, Rodgers, and Ray Luccasen and Ron Norris (two other HSA executives), was established to meet frequently to address HSA's problems. While Follmer was not told specifically of this short-term plan of action, he was informed of the role he was to play in updating the company's financial records and readying the company for sale.
Follmer was initially contacted regarding the position by Bill Miller and Associates, an executive search firm hired by HSA to recruit a qualified person to fill the position. Follmer testified that he knew about HSA's problems, and, that, in response to his expressing reservations about accepting employment with such an unstable company, a representative of Bill Miller and Associates and Rodgers told him:
 " '[A]s long as you don't have any objection against short term, possibly short term employment, you've got a great base salary plus protection of a one-year termination if anything happens. You've got . . . one-year's salary to find another job.' Tom Rodgers said the same thing on many occasions."
Follmer was interviewed twice, once by Rodgers and once by Speir. In response to a question regarding the Speir interview, Follmer testified:
 "I asked him some pointed questions based on what I was able to find out *Page 750 
about HSA. He commented that the main concern for the position was to hospital financial operations, which he knew that that was really my area of expertise at Charter that the company was having cash flow problems and having problems with control of the hospital financial operations. He explained that Tom [Rodgers] would continue to handle the bank line of credit. . . . He told me that in the background that he originally had formed HSA to build up a strong psychiatric company in five years and sell it off and at this point he didn't know if the position would last for seven months or four years but informed me that in any event I had a one-year golden parachute to protect me."
Furthermore, in regard to the representations made at the interviews, the following colloquies took place on direct and cross-examination:
 "Q. What information did Mr. Rodgers or Mr. Miller give you when they were talking about the golden parachute, if any, about the parachute being limited to merger/termination?
"A. They didn't limit it. . . .
". . . .
 "Q. . . . [W]hen you were talking with Mr. Speir and Mr. Rodgers on February 5th, 1987, you really didn't discuss the terms of your employment, did you, on that occasion?
 "A. Part of the terms, the fact that, like Charlie told me, that I would have a one year golden parachute to take back to Macon if anything happened. The specifics were to be covered.
 "Q. The terms were told to you by Mr. Speir, the terms would be set and discussed with Mr. Rodgers. He told you that, didn't he?
"A. Some of the terms, that's right, the details.
 "Q. Now, in your conversation with Charles Speir on the 5th of February, you were told that you were to have a golden parachute, were you not?
"A. That's what Charlie told me.
 "Q. And you were told that, right before that you were told that he was going to, was looking to buy or sell the company, excuse me, sell the company, isn't that correct?
"A. Yes, sir.
 "Q. And that your position could last . . . anywhere from four to seven months to four to seven years depending on offers to buy out the company?
 "A. Or to get the company refinanced and get it turned around.
 "Q. Then he told you that we have got a golden parachute for you so there won't be any problem?
"A. That's correct.
 "Q. That was right after telling you about the offers to buy out the company, depending on offers to buy out the company, isn't it?
"A. Correct.
 "Q. Then he [did] not tell you anything more specific than that about your golden parachute, did he?
"A. No, sir, not that I recall.
". . . .
 "Q. Let's talk about what you understood to be the termination agreement. Merger/Termination Agreement. You stated that you expected a contract, a written contract; right?
"A. Written agreement, yes, sir.
"Q. And you got one?
"A. I received one.
 "Q. All right. Now, you didn't write anybody or make a note on that contract or make anything in writing that you claimed would have corrected what you now say is an unclear thing about termination?
"A. I talked to Tom Rodgers about it."
In addition to the "Merger/Termination Agreement," which most, if not all, of the HSA executives had, several of the top executives had an additional agreement entitled "Employment Agreement," which provided for substantially the same benefits as did the merger agreement, but whose termination effect was not limited to the sale or change in control of the company. Coincidentally, those who had the "Employment Agreement," which provided for such termination benefits, were the persons *Page 751 
who made up the "Senior Management Organization."
Follmer testified that he was expecting to receive another agreement consistent with the pre-employment representations that he had testified about. The jury could reasonably infer that this expectation was justified in light of the fact that Follmer's merger agreement was not executed until May 7, 1987 (over two months after he was employed), allegedly due to the fact that almost everyone at HSA was working long hours during this time. To further corroborate Follmer's testimony regarding his expectation of such an agreement, the jury had for its consideration a memo that Rodgers admitted to writing, which listed Follmer, together with the other "Senior Management Organization" members, as having such an employment contract. Additionally, another memo, also bearing Follmer's name, was introduced, which set out "Termination Benefits" of those officers, all of which were considered with Follmer's testimony that he was to receive another agreement in keeping with the pre-employment negotiations with HSA.
HSA rebutted Follmer's testimony by presenting expert testimony that the term "golden parachute," in the accounting and tax field, refers to a merger/termination agreement. Other HSA executives testified that Follmer had not told them that he had an additional agreement and that they were not aware of such an additional agreement. Speir testified that he did not make any agreement with Follmer different from the "Merger/Termination Agreement." Rodgers testified that he did not promise Follmer an "Employment Agreement" and that the "Merger/Termination Agreement" was the golden parachute that was promised to Follmer. Furthermore, Joanne Boyd, HSA's in-house counsel, whose duties included gathering information regarding employee compensation for government-required disclosure statements, testified that she asked Follmer if he had another agreement with HSA besides the "Merger/Termination Agreement" and that his reply was "no." However, Boyd also testified as to the context in which her question to Follmer was asked:
 "A. Well, one of the sections in the 10-K that we had to prepare because this company was up for sale . . . we had to disclose what would happen on the sale of the company, various things that had to be paid, and that included agreements that we typically called golden parachutes. And I worked with Mr. Follmer in preparing that disclosure about what would have to be paid on a change in control of the company."
It does not appear that Boyd's question, in the context in which it was asked, would have elicited information regarding termination benefits other than those provided in the event of a sale or change in control of the company. Indeed, the jury could have reasonably concluded that Boyd's testimony was entirely consistent with Follmer's, to the effect that he expected the same termination benefits whether or not the company was sold.
As stated above, where there is conflicting testimony, it is within the province of the jury to resolve the evidence. Here, there was substantial evidence to create a reasonable inference from which the jury could find that in hiring Follmer, HSA, to induce him to accept the offer of employment, misrepresented to him that at the end of his employment, whenever that might occur, he would be entitled to termination benefits. Moreover, it is undisputed that Follmer was promised an incentive bonus, amounting to 25% of his base compensation, and purchase options on 100,000 shares of stock, none of which he received. From the totality of the circumstances, the jury could have reasonably inferred that these benefits were offered to Follmer as a further inducement for him to accept employment at HSA, which needed Follmer's expertise and experience to make the company more attractive to potential purchasers. The jury could further conclude that, once HSA had so benefitted from Follmer's services, it terminated his employment and refused payment of the termination benefits, contrary to its representations. *Page 752 
HSA contends that the stock option issue was made moot by the Securities and Exchange Commission's insider trading regulations, which prohibit an officer of a publicly held corporation from making a profit on a sale of stock of that corporation within six months after the purchase of such stock. HSA argues that the stock was below the option price during the period that Follmer could have, within the SEC regulations, retained any profits from the sale of the stock.
This argument misses the point of Follmer's claim on which the jury returned his verdict. HSA is appealing a judgment entered on Follmer's "fraud in the inducement" claim, not on his claim for breach of contract. The promise to grant Follmer the stock options, which were, for whatever reason, never granted to him, was a material part of his inducement to accept the job at HSA. Thus HSA's argument is not well taken.
Also, there is substantial evidence from which the jury could reasonably infer that the representations made to Follmer were made with the intent to deceive. Furthermore, the jury could have found that Follmer's reliance on the representations was justified. The written offer of employment did not contain any language contrary to HSA's parol representations regarding termination benefits. Although the written offer did not provide for termination benefits other than in the event of a sale or change in control of the company, there was evidence that oral promises were made guaranteeing Follmer termination benefits upon his discharge for other reasons as well.
HSA next contends that the trial court committed reversible error by permitting Follmer's lawyer to argue, over its objection, that Follmer was entitled to $116,000, which represents the amount of salary that Follmer would have received had he remained employed at HSA through February 23, 1987, and that Follmer was entitled to receive $87,500 for profits he would have made had he been granted the stock options. HSA further contends that the error was compounded by the trial court's giving the jury an instruction consistent with Follmer's argument regarding the remainder of his year's salary. We do not agree that the argument and charge objected to substantially prejudiced HSA so as to require reversal, especially in light of the fact that the jury's verdict is amply supported by the record. Furthermore, HSA has not argued, either at trial or here, that the verdict is excessive. Thus, no injury resulted to HSA from the argument and the charge and, therefore, they cannot be a basis for reversal. SeeHoffman-LaRoche, Inc. v. Campbell, 512 So.2d 725 (Ala. 1987).
Therefore, the judgment is due to be affirmed.
AFFIRMED.
HORNSBY, C.J., and ALMON, ADAMS and KENNEDY, JJ., concur.
HOUSTON and STEAGALL, JJ., concur in the result.
SHORES, J., recuses.
[1] Within the month following Follmer's discharge, negotiations began with The Paul Ramsay Group, an Australian-based holding company, for the purchase of HSA. As a result of these negotiations, The Paul Ramsay Group purchased the stock of HSA.