**David W. HAMPTON, Plaintiff–Appellee,**

v.

**INTERNATIONAL BUSINESS AND MERCANTILE REASSURANCE COMPANY, Defendant–Appellant,**

**James A. McLean, Defendant,**

**Eddie W. Pruett, Ind., and d/b/a Pruett's Insurance Agency, Third–Party Defendant.**

**No. 89–7717.**

United States Court of Appeals, Eleventh Circuit.

Sept. 4, 1990.

J. Garrison Thompson, Pitts, Pitts & Thompson, Selma, Ala., for defendant-appellant.

Steven F. Schmitt, Tallassee, Ala., Hubbard Henry Harvey, Demopolis, Ala., for plaintiff-appellee.

Before FAY and JOHNSON, Circuit Judges and GIBSON,* Senior Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge:

Appellant, International Business & Mercantile Reassurance Co. ("IB & MReC"), appeals the district court's denial of its JNOV motion after a jury verdict in favor of David Hampton, Appellee, an Alabama farmer who insured his soybean crops with IB & MReC. Hampton had sued IB & MReC for, among other things, fraud, alleging it issued to him a crop policy with a particular kind of coverage for which it knew his farm was not eligible and then later refused to indemnify him to the full extent of coverage. The jury returned a verdict of some $350,000. IB & MReC argues that the case wrongly went to the jury, particularly on punitive damages. We agree and reverse and remand as stated below.

## I. FACTS [1]

Hampton has two farms in Marengo County, Alabama—one designated D–198

---

* Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

1. Because we are reviewing the district court's denial of JNOV to IB & MReC, our consideration and recitation of the facts is in the light most favorable to the nonmovant, Hampton. *Harduvel v. General Dynamics Corp.,* 878 F.2d 1311, 1320 (11th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1479, 108 L.Ed.2d 615 (1990); *Iervolino v. Delta Air Lines, Inc.,* 796 F.2d 1408,

and the other designated F–187. He farmed soybeans on both at all times relevant to this lawsuit. In 1981, he began insuring his soybean crops by the purchase of multi-peril crop insurance ("MPCI") directly from the Federal Crop Insurance Corporation (the "FCIC").[2] This type of insurance is generally bought by the making of a promissory note to the insurer for the amount of the premium. If a condition of insurance later transpires, the premium is deducted from the indemnity paid to the insured, thereby satisfying the promissory note. Prior to the time Hampton first began buying MPCI, only the FCIC sold it. In 1980, however, the FCIC began reinsuring private insurers who could sell MPCI directly to farmers.

While Hampton bought his MPCI directly from the FCIC, he did so through the services of an agency called Osmer. In 1983 Eddie Pruett, an independent insurance agent, acquired Osmer and became the agent through whom Hampton bought his MPCI from the FCIC. Pruett became an agent of IB & MReC for purposes of selling MPCI on February 15, 1985. On February 28, 1985, Hampton applied for MPCI for his two farms with IB & MReC, which was in turn reinsured by the FCIC.

In 1983, the FCIC first allowed a particular kind of MPCI to cover farms—individual yield coverage ("IYC"). IYC covers a farm based on that farm's particular production history in bushels per acre. Prior to 1983, the FCIC only provided for area plan coverage, which is based on average yields in bushels per acre established according to actuarial tables and the production average of the farms in a given area. Apparently the local Agricultural Stabilization Conservation Service (the "ASCS") committee keeps the necessary records for setting the applicable area plan coverage. IYC coverage would be superior to area plan coverage for those farms that produced a higher yield than the average yields reflected by the ASCS. In 1983 and 1984, IYC could be provided to farms that had at least a three-year production history or, failing a three-year history, that had a yield established by the local ASCS committee. In December 1984, however, the FCIC changed its IYC regulations and disallowed the alternative method of obtaining IYC on farms without the requisite three-year production history. Thus, beginning in 1985, if a farm did not have a three-year production history, it could not qualify for IYC.

Buying his MPCI through Pruett and the FCIC, Hampton received IYC coverage for both his farms in 1983 and 1984. Farm D–198 had the necessary three-year production history, while farm F–187 was given a yield average by the local ASCS committee to qualify for IYC. Of course, F–187 was no longer eligible for IYC in 1985 because of the FCIC rule change.

Nevertheless, as revealed above, in late February 1985, Hampton applied for MPCI in the form of IYC for both farms with IB & MReC via Pruett. At the same time, Hampton terminated his coverage with the FCIC which was otherwise automatically renewable. Pruett did not tell Hampton that F–187 was not eligible for IYC, though the parties stipulated that at the time Pruett knew or should have known F–187 was not eligible. Pruett testified he was not attempting to deceive Hampton; Hampton testified that he did not believe that Pruett was intentionally deceiving him.

Acreage reports issued by IB & MReC throughout 1985 reflected that F–187 had IYC, until a report from October of that year. The final acreage report that Hampton saw was from July of 1985 and showed F–187 with IYC. However, a report of October 7, 1985, which Hampton did not see until this lawsuit, showed F–187 with only area coverage. Thereafter, all acreage reports showed F–187 with only area coverage. Thus, at some point, IB & MReC realized or decided that F–187 could not qualify for IYC, which was a fact, of course, extant on its own.

1418 (11th Cir.1986), *cert. denied,* 479 U.S. 1090, 107 S.Ct. 1300, 94 L.Ed.2d 155 (1987).

**2.** The current provisions of the United States Code relating to the FCIC are found at 7 U.S.C. §§ 1501–1520 (1988).

Hampton's soybean farming operation sustained a loss for 1985 on both farms. At harvest time, F–187 brought in only about nine bushels per acre. He filed a claim for both under his IB & MReC policy in November 1985. An adjuster came out later that month and completed an adjustment worksheet based on IYC coverage. This worksheet, however, was amended at the IB & MReC claims office in Charlotte, North Carolina, to indemnify Hampton by only area coverage on *both* farms for fourteen to sixteen bushels per acre. Ultimately, IYC was paid by IB & MReC on D–198. The extent of F–187's coverage (and other attendant damages to Hampton) is the dispute in this case.

Thus, the factual changes and misunderstandings were set for the 1985 crop year. They remained so until IB & MReC tried to straighten them in late 1985. By then, however, Hampton felt aggrieved and later filed this lawsuit. Hampton contended that he had grounds to believe F–187 had IYC. Whether or not he was led to believe that in a deceptive manner amounting to fraud is the legal question posited.

Hampton first sued IB & MReC, another named defendant, and fictitious defendants in October 1986 in Alabama state court for breach of insurance policy, fraud, and bad faith refusal to pay, seeking compensatory and punitive damages. IB & MReC became the sole remaining defendant at some later date and the case was removed to federal district court in Alabama in March 1988. Just prior to that time, Hampton amended his complaint against IB & MReC alleging further fraud by IB & MReC by its representations to him that F–187 had IYC.

At trial, the parties stipulated to many facts,[3] the most important of which for our purposes are the following: 1) that F–187 was not eligible for IYC in crop year 1985 due to applicable FCIC regulations, 2) that F–187 was not eligible for IYC in crop year

1985 under the insurance policy issued by IB & MReC to Hampton thereon, 3) that Pruett was a licensed soliciting agent for IB & MReC when Hampton applied for MPCI with IB & MReC in 1985, and 4) that Pruett knew or should have known that F–187 was not eligible for IYC at the time Hampton applied for IYC on February 28, 1985.

The case went to trial in late April 1989. Primarily by his own testimony, Hampton put on evidence that he was damaged by IB & MReC's alleged fraud in the amount of $40,000 in farming losses for the 1985 year, $37,000 in losses from the sale of soybean equipment, and $23,505 in losses from the difference between the IYC he thought he had on F–187 and the area coverage which he actually had. His complaint prayed for $750,000 in damages, including mental anguish and punitive damages.

IB & MReC moved for a directed verdict at the close of Hampton's evidence arguing, inter alia, that the evidence produced by Hampton did not show fraud or fraudulent misrepresentations. The district court granted a directed verdict with respect to Hampton's bad faith claim. But the district court concluded that the case should go to the jury on the claims of innocent and willful fraud connected to IB & MReC's knowledge of the ineligibility of F–187 for IYC.[4] The district court relied on the stipulation that in February 1985 Pruett knew or should have known that F–187 was ineligible for IYC to send the case to the jury as to IB & MReC's like knowledge.

IB & MReC put on its case, and afterwards the whole case was submitted to the jury for determination of the fraud claims for compensatory and punitive damages. After a little more than an hour's deliberation, the jury returned a general verdict of $350,000 for Hampton. IB & MReC filed a motion for JNOV or in the alternative for a new trial or for amendment or vacation of

---

3. All the stipulated facts appear in the Record on Appeal, Vol. 4 at 54–59.

4. While the district court first suggested that it thought the breach of contract claim should go to the jury, Record on Appeal, Vol. 6 at 522, the court later refused the plaintiff's suggested in-

structions relating to contract damages as inapplicable. Record on Appeal, Vol. 2, Plaintiff's Requested Jury Instructions at 7–8. The jury was instructed only on the fraud claims. Record on Appeal, Vol. 7 at 845–46.

the judgment. The motion again argued that Hampton had failed to show fraud or misrepresentation by IB & MReC sufficient to support a verdict against it, but again was denied by the district court. IB & MReC took this appeal advancing error by the district court for failure to grant the JNOV motion.

## II. ANALYSIS

The question in this case is whether IB & MReC's acts constituted intentional fraud under the law of Alabama, and we begin with an overview of that law. The elements of fraud in Alabama have been recently described as follows:

1) misrepresentation of a material fact; 2) made willfully to deceive, or recklessly without knowledge; 3) which was justifiably relied upon by the plaintiff under the circumstances; and 4) which caused damage as a proximate consequence.

*Ramsay Health Care, Inc. v. Follmer*, 560 So.2d 746, 749 (Ala.1990) (citation omitted). *See also AT & T Information Systems v. Cobb Pontiac–Cadillac*, 553 So.2d 529, 532 (Ala.1989) (quoting *Padgett v. Hughes*, 535 So.2d 140, 142 (Ala.1988)); *Leisure American Resorts, Inc. v. Knutilla*, 547 So.2d 424, 426 (Ala.1989); Ala.Code § 6–5–101 (1975).[5]

█ If met, the elements above entitle a plaintiff to compensatory damages. Hampton sought and received punitive damages as well. Punitive damages are recoverable in fraud actions only where the plaintiff has proven the defendant had knowledge of the falsity of a material misrepresentation made by him, *State Farm Fire & Cas. Ins. v. Lynn*, 516 So.2d 1373, 1376 (Ala.1987), or where "the misrepresentation is made so recklessly and heedlessly as to amount to the same thing as knowledge of its falsity." *Id.* (citation omitted). Said another way, there must be "evidence from which the jury can reasonably infer an *intent to deceive* or defraud." *Alfa Mutual Ins. Co. v. Northington*, 561 So.2d 1041, 1046 (Ala. 1990) (emphasis added).

Finally, with respect to Alabama law, we consider the extent to which IB & MReC can be guilty of fraud committed by its agents. "[I]t is old learning that the misrepresentations of material facts made by an agent, which are made within the scope of the agent's authority, are imputable to the principal." *Leisure*, 547 So.2d at 426 (citations omitted). Hampton has alleged that the combined acts of several of IB & MReC agents amount to fraud. Such combined acts can amount to fraud by a corporation, even where an individual agent may lack the requisite intent to commit fraud. *Id.*

Taking the applicable law above, we now apply it to the facts of this case, which we have taken in the light most favorable to Hampton in keeping with our review of the district court's denial of JNOV to IB & MReC. "A mere scintilla of evidence is insufficient to present a question for the jury." *Boeing Company v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969) (en banc). The Eleventh Circuit has consistently applied the standard from *Boeing*. *See Adams v. Bainbridge–Decatur County Hosp. Auth.*, 888 F.2d 1356, 1363 n. 18 (11th Cir.1989); *American Family Life Assur. Co. v. U.S. Fire Co.*, 885 F.2d 826, 830 (11th Cir.1989). The scintilla rule no longer obtains under Alabama law, Ala.Code § 12–21–12 (Cum. Supp.1989), but was applicable when this case was first filed. We think the Eleventh Circuit rule applied in *Boeing* would, in any event, control on this issue.

█ We will reverse the district court's denial of JNOV if "the evidence so strongly points in favor of one party that reasonable men could not reach a contrary verdict." *Iervolino*, 796 F.2d at 1419 (citations omitted). We believe the evidence here does so strongly point in favor of IB & MReC on the question of intentional fraud.

█ We will first assume that all of Pruett's knowledge (if any) with respect to F–187 is imputable to IB & MReC, though IB & MReC has advanced arguments that

5. For extensive discussions of the law of fraud in Alabama see both the majority and concurring/dissenting opinions in *First Alabama Bank*

*of Montgomery v. First State Ins. Co.*, 899 F.2d 1045 (11th Cir.1990).

Pruett's knowledge was acquired by him as an agent of the FCIC, not of IB & MReC, and though we are not convinced that such an assumption is correct. Nevertheless, making the assumption, we can conclude that IB & MReC knew or should have known that F–187 was ineligible for IYC in 1985, as it was stipulated that Pruett knew or should have known that fact.

If the jury concluded that Pruett (and perhaps IB & MReC) *knew* of F–187's ineligibility for IYC, most of the elements of fraud are present to this point. IB & MReC would have falsely represented a material fact to Hampton—that F–187 could be insured by IYC. Hampton would have relied on that representation to his proximate damage by planting soybeans on F–187 and sustaining a loss. However, that is not the end of our inquiry. The stipulation as to Pruett's knowledge allows room to conclude only that Pruett (and perhaps IB & MReC) should have known of F–187's ineligibility.

More importantly, the question remains whether IB & MReC intended to commit a fraud against Hampton (i.e., willfully to deceive him) by representing to him that F–187 had IYC when IB & MReC knew or should have known that F–187 did not qualify for IYC and by ultimately denying IYC on F–187 pursuant to FCIC regulations. We must put together the knowledge of Pruett (imputed to IB & MReC) with the actions of IB & MReC (the representations to Hampton of IYC for F–187 and later denial of IYC) to determine whether IB &

MReC had the requisite intent to defraud Hampton.[6]

We conclude that IB & MReC did not make the representations that F–187 had IYC willfully to deceive Hampton. IB & MReC could only cover F–187 to the extent allowed per FCIC regulations. That it might be said that IB & MReC knew or should have known that F–187 was not eligible for IYC does not mean that IB & MReC made false representations with knowledge or an intent to deceive Hampton. The evidence is to the contrary. Both Hampton and Pruett testified that the latter did not intend to deceive the former. Nothing in our review of the record shows knowledge, intent, or recklessness amounting to the equivalent of intent on IB & MReC's part to support either all the compensatory or any punitive damages verdicts based on fraud under the law of Alabama.[7]

Because of its distinctive facts, comparison to the case of *Alfa, supra,* illustrates why we reach our result in this case. In *Alfa,* Northington paid a premium up front on a policy covering his mobile home. He was induced to do so on the intentional misrepresentation that the policy covered theft, which it did not. Northington sued Alfa after it refused to indemnify him for losses due to theft from his mobile home. The Alabama Supreme Court upheld compensatory damages of some $3,000 and punitive damages of $300,000 against Alfa based on the intentional misrepresentation to Northington by Alfa's selling agent.

---

6. We note that Hampton has made much of his efforts to convert his soybean farms into cattle and catfish operations. Likewise he testified that he would not have put in soybeans in 1985 if he had known F–187 was ineligible for IYC. Rather, he would have continued the enlargement of his cattle and catfish farms. Further, he has suggested that the evidence tends to show that Pruett knew all of this when he advised Hampton as to MPCI in February of 1985. While this evidence may be relevant as to the extent of Hampton's reliance on the representations that he had IYC, we do not consider it as any evidence of intent on the part of IB & MReC to defraud Hampton.

7. Hampton has pointed to evidence that an employee of IB & MReC at its Charlotte claims office prevaricated in her description of how the

decision to cover a farm by IYC or area coverage is made. At one time in correspondence to Hampton in February 1986, she indicated the local actuarial office controlled the determination, but later she testified at trial that it was strictly the decision of the claims office. We do not think that this information could have been relied on by Hampton at all in his decision to apply for IYC in February of 1985. We conclude that, while the information supplied to Hampton may have been misleading, it falls well short of a deception that could support a claim of fraud from a year earlier.

Part of the problem with MPCI in this regard seems to be that an insured can *apply* for one type of coverage, but *receive* another because a final determination by the insurer of the eligibility of the insured's farm is not made concurrently with the insured's application.

Though the Alabama Supreme Court concluded that intentional misrepresentation had induced Northington to purchase the policy, we do not conclude, *sub judice*, that IB & MReC had any intent to deceive Hampton to induce him to purchase a policy.

While IB & MReC's actions where a bit like not letting the right hand know what the left was doing, and probably poor business practice, we conclude that reasonable minds could not reach a finding of intentional fraud to support all the compensatory or any punitive damages. The district court, therefore, erred by denying IB & MReC's motion for JNOV on the claims of fraud, and its judgment is reversed as to all damages save those that may lie in the difference between IYC and area coverage on F-187.

We cannot say from the general verdict how the jury attributed damages, if at all. We have concluded that as a matter of law the punitive damages and most of the compensatory damages sought cannot here be based on intentional fraud. Because the record evidence does not precisely determine the indemnity Hampton would have received under IYC over and above what he did receive under area coverage on F-187, the case is remanded on that point.

## III. CONCLUSION

This was not a case of someone changing the rules in the middle of the game. That's generally intentional fraud on someone's part. Here the rules were changed by the FCIC before the beginning of the 1985 season. Hence, this was more of a case of invoking the rules late in the game. A late invocation of the rule book by IB & MReC is the most the record evidence shows in this case, thus IB & MReC should have been granted its JNOV motion, and the judgment of the district court is reversed accordingly.[8] However, because the evidence may demonstrate what the district court characterized as fraud by mistake,[9] the case is remanded for determination of the difference between IYC and area coverage on F-187.

---

**8.** Because of the disposition we have given this case, we do not reach IB & MReC's question about its immunity from punitive damages as an agent of the FCIC.

**9.** *See* Record on Appeal, Vol. 6 at 523. The district court, though ultimately letting the case go to the jury on all the fraud counts for compensatory and punitive damages, responded in part to IB & MReC's first motion for a directed verdict that there was a lack of intent to support punitive damages. We agree.