BEATTY, Retired Justice.
The plaintiffs, Darrell D. Smith and Hooks Catfish, Inc., d/b/a Hooks Catfish Restaurant (“Hooks Catfish”), appeal from a judgment in this nonjury case for the defendants, Hurricane Freddy’s Inc., Chris Ybarra, and Frank Martin. Our supreme court transferred the appeal to this court pursuant to § 12-2-7(6), Ala.Code 1975. We reverse and remand.
In early 1994, Smith and his wife, Linda, consulted a real estate agent, Lois Walker, about locating a site at which the Smiths could open a catfish restaurant. In February 1994, Walker informed them that Hurricane Freddy’s, a restaurant business owned by Ybarra and Martin, was for sale. Hurricane Freddy’s leased space in the Bayou Village Shopping Center in Gulf Shores. The lease Ybarra and Martin had with their landlord, Bayou Village Joint Venture, required that their restaurant sell only Mexican food, hamburgers, deli sandwiches, and appetizers; that the name of their restaurant be Hurricane Freddy’s; and that any changes in the lease be approved in writing by the landlord. The Smiths told Walker that they would be interested in purchasing Hurricane Freddy’s only if they could sell farm-raised catfish there and if they could change the name to Hooks Catfish Restaurant. The Smiths made a written offer to assume the lease and to purchase the assets of the business “contingent on Buyer being able to serve freshwater catfish.” During the negotiations concerning the purchase of Hurricane Freddy’s, the Smiths say, Ybarra and Martin represented to them thát the landlord had approved the Smiths’ request to change the menu and the name of the restaurant. The Smiths say that, in reliance upon the representation that the landlord had agreed to allow their requested changes, they decided to purchase the business. The parties agreed upon a purchase price of $55,000. The Smiths paid $30,000 down and signed a promissory note for $25,000 to be paid in 90 days. They also assumed the Hurricane Freddy’s lease with Bayou Village Joint Venture.
The Smiths opened their restaurant on March ,7, 1994. They took down the Hum- *176 cane Freddy’s sign and put up a sign bearing the name “Hooks Catfish Restaurant.” They also changed the menu, serving freshwater catfish instead of Mexican food, plus steak and chicken entrees, hamburgers and sandwiches, and appetizers. On March 11, 1994, the Smiths received a letter from Vince Cave of L.W. Cave Real Estate, Inc., the company that managed the shopping center. Cave informed them that he was aware they had changed the menu and the name of the business and stated that there had been “no contact with the Landlord for any changes regarding this business or the trade name of the business.” The Smiths’ attorney contacted Cave regarding the Smiths’ understanding that the changes they had made in the business had been approved. On April 26,-1994, the Smiths received another letter from Cave in which he stated that the owners of Hurricane Freddy’s had been informed, before they sold the business, that no changes in the lease would be allowed. The Smiths closed Hooks Catfish Restaurant on May 31, 1994, without paying the $25,000 note due to Ybar-ra and Martin.
Darrell Smith and Hooks Catfish then sued Hurricane Freddy’s, Ybarra, and Martin. They alleged that Ybarra and Martin had made a fraudulent misrepresentation to Smith and they sought rescission of the promissory note and damages. Hurricane Freddy’s, Ybarra, and Martin counterclaimed, seeking payment on the note. After hearing testimony presented ore tenus, the, trial court entered a judgment in favor of the defendants and awarded damages of $25,000 to them on their counterclaim. The court held that Smith’s reliance upon the representation allegedly made by Ybarra and Martin was not justifiable and that Smith and Hooks Catfish did not prove that the restaurant was closed because of the alleged misrepresentation.
Smith and Hooks Catfish contend that the trial court’s judgment, as amended, was contrary to law and was not supported by the evidence presented at trial. Because Smith and Hooks Catfish appeal from a judgment based upon evidence presented oré ten-us in a nonjury trial and challenge the trial court’s factual findings, this court must apply the following standard of review:
“Under the ‘ore tenus rule,’ a presumption of correctness accompanies the trial court’s judgment when it has made findings of fact based on oral testimony without a jury, and its judgment will not be reversed unless it is shown to be plainly and palpably wrong, considering all of the evidence and all inferences that can be logically drawn from the evidence.”
Clark v. Albertville Nursing Home, Inc., 545 So.2d 9, 12-13 (Ala.1989) (citations omitted). See also Equipment Leasing v. Childers, 611 So.2d 224 (Ala.1992).
At trial, the Smiths testified that Linda Smith handled most of the transactions regarding the purchase of the restaurant, because Darrell Smith was out of town. Darrell Smith gave his wife a power of attorney allowing her to sign the documents necessary to close the purchase of the business. Darrell Smith had seen a copy of the lease he would be assuming, but Linda Smith had not. Linda Smith testified that she told Ybarra and Martin early in the negotiations concerning the' purchase of Hurricane Freddy’s that she and her husband were interested in purchasing the restaurant only if they could sell catfish and could change the name of the business. She stated that she did not talk further with them about those changes, but communicated thereafter through Walker.
Walker testified that she was aware of the Smiths’ requirements in purchasing a restaurant and testified that Ybarra and Martin knew that the Smiths wanted to sell catfish instead of Mexican food and wanted to change the name of the restaurant. She stated that Ybarra and Martin did not tell her that the lease would have to be changed in order to accomplish those objectives. Walker testified that Ybarra and Martin informed her they would meet with the owners of the shopping center and would discuss with them the Smiths’ requested changes in the lease. She said they later informed her that “it was gonna be all right.” Walker stated that neither Ybarra nor Martin ever specifically told her the owners had agreed to modify the lease, but that she was told “it was gonna be okay.” She said that she *177 “assumed that everything was all right with the sale the way it was going” and that she passed that information along to the Smiths. Walker stated that she had several discussions with Ybarra and Martin about whether catfish.was considered “seafood,” and that she understood that the landlord did not consider catfish to be a form of seafood and did not object to the name change. She thought “everything was worked out.” When asked if she had ever heard Ybarra or Martin tell the Smiths that Cave had modified the terms of the lease, Walker stated:
‘What they told — modifying the lease, I don’t recall that. But they did assure them that it was okay to sell catfish. And the name of the business was very important to Mrs. Smith. It was a family name. And so they said that was all right. So as far as telling them or me that they had modified it, no. But they told them it was all right. They assured them it was okay.”
Ybarra testified that he talked to Walker about whether the Smiths would be allowed to sell catfish, but that he never talked to her about the name change. He stated that he talked by telephone to Cave ahout the Smiths’ desire to sell catfish at the restaurant, and he said that Cave “verbally approved with me over the telephone that he would allow them to assume the lease knowing that they were going to sell catfish.” Ybarra further testified that he spoke with Cave several times regarding the sale of Hurricane Freddy’s and whether catfish was technically a seafood item, and that Cave said “that was fine [for the Smiths to serve catfish] and that he approved.” Ybarra said he didn’t recall any discussion of the name change with anyone until after the closing. He also said he was not aware that any changes to the lease had to be approved in writing.
Cave, on the other hand, testified that he had discussed with Ybarra whether a new tenant could sell catfish, and that he told Ybarra that the lease “would be assigned as it was written and there would be no changes to the lease.” Cave said the owners of Hurricane Freddy’s “were told ... that if the business was sold to someone and they went in there and sold catfish then we would have to cross that bridge when we came to it.” Cave stated that a major tenant in the shopping center, the Original Oyster House, “didn’t want another restaurant in there that sold fish in any manner.” In his letter to the Smiths of April 26, Cave clearly stated his position regarding any changes to the Hurricane Freddy’s lease:
“The purpose of this letter, at your request, is to verify certain information leading up to your purchase of the business known as Hurricane Freddy’s, in the Bayou Village Shopping Center, in Gulf • Shores, Alabama.
“The previous owners of Hurricane Freddy’s did make inquiries to our office as to the possibility of serving catfish at this location. It was indicated that they had a prospect that would want to serve catfish. -They further indicated that if this prospect did not purchase the business, they were going to sell catfish themselves.
“L.W. Cave and myself had a general conversation concerning this issue. Hurricane Freddy’s was informed that the owners of the shopping center would not change the lease in any manner at this time. The owners of Hurricane Freddy’s were told they could sell their business to any qualified prospect, but the lease would have to be assigned to the buyer and remain in place as it was written.
“I was later informed there was a buyer for the business and could I furnish the sellers with a copy of a lease assignment, that would be acceptable to the owners of the shopping center. I provided the sellers with a copy of a lease assignment for their convenience.
“The previous owners of Hurricane Freddy’s sold the business based on the lease being assigned as written. They were told that the Landlord would only approve the assignment of a qualified buyer. Furthermore, that there would be no changes to the lease concerning the sale of catfish or any other item.”
The Smiths testified that after they discovered that the shopping center’s landlord had not consented to any changes in the lease they had assumed, they tried to obtain the changes they needed. Their attorney wrote *178 to Cave and formally requested that the Smiths be allowed to change the menu and the name of the restaurant. In response, Cave testified, he told the Smiths’ attorney that although the landlord would not try to prevent their serving catfish at that time, the landlord would not agree in writing to modify the shopping center lease and, Cave said, he could not “predict the future.” . Cave also testified that if the Original Oyster House had complained about the presence of Hooks Catfish, he would have been in a position to enforce the terms of the lease. Upon learning that the landlord would not agree to modify the lease, the Smiths decided to close the business, even though. Cave never ordered them to stop selling catfish or to take down their sign. Linda Smith stated that she and her husband did not want to continue to put money into a business that they might have to close at any time.
Legal fraud is defined in § 6-5-101, Ala. Code 1975:
“Misrepresentations of a material fact made willfully to deceive, or' recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud.”
To prevail on a fraud claim, a party must prove (1) that there was a false representation; (2) that the false representation concerned a material existing fact; (3) that the party relied upon the false representation; and (4) that the party was damage'd as a proximate result of relying on the false representation. Cowen v. M.S. Enterprises, Inc., 642 So.2d 453 (Ala.1994).
After reviewing the record as a whole, we conclude that Smith and Hooks Catfish proved all four elements necessary to prevail in their action for fraud. Ybarra and Martin represented to the Smiths, either directly or through Walker, that the landlord had agreed to approve changes in the lease; that representation clearly was false. The false representation concerned a material existing fact — that Smith would not have purchased Hurricane Freddy’s without the assurance that he could change the menu and the name. Under the circumstances, Smith and Hooks Catfish justifiably relied upon the representation. Their reliance would have been unjustifiable as a matter of law only if the representation was “ ‘so patently and obviously false that [the plaintiffs] must have closed [their] eyes to avoid the discovery of the truth.’ ” Hickox v. Stover, 551 So.2d 259, 263 (Ala.1989) (quoting Southern States Ford, Inc. v. Proctor, 541 So.2d 1081, 1092 (Ala.1989)) (interpolations in Hickox ).[1] See also Ramsay Health Care, Inc. v. Follmer, 560 So.2d 746 (Ala.1990). Smith and Hooks Catfish were damaged as a proximate result of Smith’s relying on the false representation. They were left with the choice of closing the restaurant or continuing to operate despite the risk of having to close at any time. Because Smith and Hooks Catfish should prevail on their fraud claim, it follows that the defendants cannot prevail on their counterclaim.
Based on the evidence presented to the trial court, we conclude that the judgment of the trial court was plainly and palpably wrong. The judgment, therefore, is hereby reversed and the cause is remanded. On remand, the trial court is instructed to enter a judgment of liability against the defendants, to determine the damages to be awarded Smith and Hooks Catfish, and to make an award of damages. Any party displeased after the trial court has entered a final judgment on remand may then appeal, according to the Rules of Appellate Procedure.
The foregoing opinion was prepared by Sam A. Beatty, Retired Justice, Supreme Court of Alabama, while serving on active duty status as a judge of this court under the provisions of § 12-18-10(e), Ala.Code 1975.
REVERSED AND REMANDED WITH INSTRUCTIONS.
ROBERTSON, P.J., and YATES and MONROE, JJ., concur.
*179 CRAWLEY and THOMPSON, JJ., dissent.

. We note that the "justifiable reliance” holding of Hickox has been overruled by our supreme court in Foremost Ins. Co. v. Parham, 693 So.2d 409 (Ala.1997). The “justifiable reliance” standard has been replaced with the "reasonable reliance” standard. The new standard, however, is applicable only to fraud cases filed after March 14, 1997.