BEATTY, Retired Justice.
The plaintiffs, Greg Hunter and Renea Hunter, appeal from a summary judgment entered in favor of the defendants, State Farm Fire and Casualty Company, Inc.; Bill Alexander, Jr.; and the State Farm agency of Bill Alexander, Jr. Our supreme court transferred the appeal to this court pursuant to § 12-2-7(6), Ala.Code 1975. We affirm in part, reverse in part, and remand.
In mid-1994, State Farm issued to the Hunters an insurance policy covering their 1985 Chevrolet pickup truck. Alexander was the Hunters’ insurance agent. The Hunters had been State Farm insureds through Alexander’s agency for several years. In late 1994, the Hunters received a routine notice from State Farm advising them that their policy would expire on December 13, 1994. The Hunters’ policy had a 22-day grace period that allowed them to maintain continuous coverage if they paid an overdue premium within 22 days after the pokey’s expiration date.
On December 30, 1994, Susan Morris, an employee in Alexander’s office, telephoned Renea Hunter to remind her that the premium payment was due. Morris testified that one of her duties was to make reminder calls to policyholders and that she did so every day. Morris stated she received from State Farm a list of Alexander’s customers whose insurance policies soon would expire. Upon receiving the list, she says, she used a calendar to count 22 days from each insured’s policy expiration date noted on the list, then made a notation on the list of the final day of the grace period, on which the policy would lapse at 12:01 A.M. Morris testified that she then called the customers on the list to remind them that their premiums must be paid by the close of business on the day before the policy lapse date. Morris says she remembered talking to Renea Hunter and says that she would have told Renea Hunter that her premium was due by the close of business on January 4, the day before the Hunters’ policy lapse date. The list from which Morris was working on December 30 has the notation “1/5” by the Hunters’ entry, as well as the notation “Rena [sic] will be in.” Renea Hunter testified, however, that Morris told her the premium was due on “Friday.” January 6,1995, was a Friday.
At approximately 5:00 A.M. on January 6, Greg Hunter was involved in an automobile accident in which he was injured and the 1985 Chevrolet pickup truck was badly damaged. During the early morning hours of January 6, Renea Hunter telephoned Alexander’s office and left a message on the answering machine saying that her husband had been in an accident that morning and that she would come to the office that day to pay her premium. Scott Hunter, Greg’s brother, *430 took Renea Hunter to Alexander’s office on the morning of January 6.
When Renea Hunter arrived at Alexander’s office, she spoke first with one of Alexander’s employees, Teresa McAnalley, who had received her message on the answering machine. Renea Hunter says she told McA-nalley that her husband had been in an accident and says that McAnalley asked how he was doing, what had happened, and what kind of damage had been done to the truck. It is undisputed that McAnalley then went to her computer to give Renea Hunter the exact amount of the premium due, and, upon looking at the computer entry, told Renea Hunter that the computer entry indicated that the Hunters’ policy was out of force. Renea Hunter testified that she was “stunned” and that she told McAnalley that Morris had told her the premium was due on Friday. McA-nalley says that Renea Hunter was upset and very emotional about the situation. At that point, McAnalley asked Alexander to come to the front of the office, where she, Renea Hunter, and Scott Hunter were sitting.
Renea Hunter says that Alexander told McAnalley to “go ahead and take her premium payment and treat it like she is covered,” and that she then wrote the premium amount on a check she had partially completed the night before. She gave the check to McAnal-ley, who stamped it for deposit. Scott Hunter also testified that Alexander told McAnal-ley “just to receive the check as coverage is there.” Renea Hunter says that before she left Alexander’s office, both he and McAnal-ley told her not to worry. She also says that if she had been told that the accident would not be covered, she would not have paid the premium, because, she says, the truck was a total loss and there was nothing left to insure.
Alexander and McAnalley testified that they told Renea Hunter only that her situation would have to be reviewed by State Farm’s claims office. McAnalley says that after Renea Hunter gave her the check for the premium, she asked Renea Hunter to sign a “Receipt of Remittance” form. The form contains the following printed statement:
“I have been informed by my State Farm agent that the Company does not intend to reinstate this policy so as to provide coverage during the period that the policy was out of force.
“It is therefore understood and agreed that receipt of this remittance does not reinstate the insurance prior to_ (time) AM PM_(date).”
A handwritten notation of “9:16” was placed on the “time” line, “AM” was circled, and a handwritten notation of “1-6-95” was placed on the “date” line. Renea Hunter’s signature appears on the form beside an “X” marked on a line for the “Policyholder’s Signature.” In addition, the word “yes” is handwritten in a blank beside the question: “Has there been a loss in time out of force period?” Renea Hunter acknowledges that the signature is hers, but says that she does not remember signing the form, that she did not receive a copy of it, and that she became aware of it only when it was produced during the course of this litigation. McAnalley testified that she remembered sliding the form across her desk for Renea Hunter to sign, but says that she does not remember whether she filled in the blanks on the form before or after Renea Hunter left the office. She also says that she does not think she gave Renea Hunter a copy of the form.
State Farm’s claims office investigated the Hunters’ claim and ultimately denied coverage. The Hunters then sued State Farm and Alexander, alleging breach of contract, fraud, and bad faith refusal to pay. They later added Alexander’s agency as a defendant. The defendants moved for a summary judgment, which the Hunters opposed. All parties filed the appropriate evidentiary submissions. After a hearing, the trial court entered a summary judgment in favor of the defendants.
The Hunters argue that they presented substantial evidence as to their breach of contract and fraud claims and thus precluded the entry of a summary judgment against them. They also argue that the trial court should have stricken certain deposition testimony offered by the defendants in support of their summary judgment motion. The Hunters do not address their bad faith claim; *431 therefore, any argument that the Hunters may have had regarding that claim is deemed waived and the judgment is due to be affirmed as to the bad faith claim. Harris v. Gill, 585 So.2d 831 (Ala.1991).
Our standard for reviewing a summary judgment is well settled. The summary judgment was proper if there was no genuine issue of material fact and the defendants were entitled to a judgment as a matter of law. Rule 56, Ala. R. Civ. P. The defendants had the burden to make a prima facie showing that no genuine issue of material fact existed and that they were entitled to a judgment as a matter of law. Long v. Jefferson County, 623 So.2d 1130 (Ala.1993). If the defendants made that showing, then the burden shifted to the Hunters to present evidence creating a genuine issue of material fact, so as to avoid the entry of a judgment against them. Id. In deciding whether there was a genuine issue of material fact, we view the evidence in the light most favorable to the nonmovant and resolve all reasonable doubts against the movant. Id. The applicable standard of review is the “substantial evidence” rule. § 12-21-12, Ala.Code 1975. “Substantial evidence” is defined as “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989).
We first address the Hunters’ claim alleging breach of contract. In Central Nat’l Ins. Group of Omaha v. Grimmett, 340 So.2d 767 (Ala.1976), our supreme court stated that when an insurance company accepts a premium payment on a lapsed policy with knowledge that an accident has occurred during the lapse period, the company has three options.
“First, the insurer may return the premium for the lapsed period; second, it may apply the premium from the date it was received forward ...; or, third, it may retain the premium and cover the collision loss.”
340 So.2d at 767-68 (citations omitted). The court went on to say, however, that if an insurance company chooses the second option, “this intent must be clearly conveyed to the insured before premium payments are accepted.” Id. at 768. Even if State Farm chose the second option, if the defendants did not clearly convey their intent to “apply the premium from the date it was received forward,” the company will be estopped from denying coverage. Id. at 767-68. See also American Cas. Co. v. Wright, 554 So.2d 1015 (Ala.1989).
The defendants argue that the Receipt of Remittance form clearly conveyed their intent to apply the Hunters’ premium payment prospectively. We disagree. First, according to the testimony, Renea Hunter was not asked to sign the form until after she had given her check to MeAnalley. Second, the Hunters were not given a copy of the form. Third, MeAnalley testified that she may have asked Renea Hunter to sign a blank form and that she was not sure whether she discussed the form with Renea Hunter.
“Q. ... [Tjhen what happened after that, Teresa?
“A. In accepting her payment, I told her that she would need to sign a form that we provide showing that she has had an accident during the time that her policy had been out of force.
“Q. And did she sign that?
“A. Yes, she did.
[[Image here]]
“Q. Did you fill this out right there or did you just ask her to sign it?
“A. I filled out the form with the exception of her signature and the ‘yes’ down at the bottom.
“Q. Was that before she signed it or after she signed it?
“A. I don’t remember.
“Q. Okay. Could it have been before she signed it?
“A. Yes, it could have been.
“Q. Could it have been after she signed it?
“A. Could have been.
[[Image here]]
“Q. ... [D]id you tell her that this would reinstate the policy?
“A. Yes, I did.
*432 “Q. ... [Y]ou didn’t tell her, though, that, Ms. Hunter, you won’t have any coverage until 9:16 today, forward?
“A. Normally, that’s what I tell people, that this reinstates from this minute forward.
“Q. Did you tell her that?
“A. I don’t remember.”
Regarding the receipt of remittance form, Renea Hunter testified as follows:
“Q. ... Teresa gave you a form, a receipt of remittance, which specifically tells you that your policy is not being reinstated ...; do you recognize that document?
“A. I do only because my attorney has showed it to me.
“Q. Is that your signature?
“A. Yes.
“Q. ... [D]o you remember her putting that document in front of you and saying Renea, I need you to sign this?
“A. Possibly.
“Q. Okay. And do you remember her explaining to you when she was telling you that this would probably have to go to a committee, that that document tells you that — that wreck may not be covered?
“A. No.
“Q. You don’t remember Teresa saying that?
“A. She didn’t say that.
“Q. What did she tell you about that document?
“A. I need you to sign this right here where I put an X.
“Q. And she didn’t explain it to you?
“A. Not that I can recall.”
The defendants submitted copies of Receipt of Remittance forms that Renea Hunter had signed on previous occasions, and they argued that because she was familiar with the form she knew that her premium would be applied prospectively only. Renea Hunter testified, however, that although she recognized her signatures, she did not recall signing the forms, and, she says, she did not understand what they meant. Renea Hunter’s possible familiarity with the form is immaterial, however, in light of her testimony that on this occasion, Alexander told McAnal-ley to accept her check as though she were covered, especially if she signed a form on which the time and date of the policy’s effectiveness were not yet written. We conclude that there is a genuine issue of material fact as to whether the defendants clearly conveyed to Renea Hunter their intent to accept her premium prospectively.
We now address the Hunters’ fraud claims. “Legal fraud” is defined in § 6-5-101, Ala. Code 1975:
“Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud.”
To prevail on a fraud claim, a party must prove (1) that there was a false representation; (2) that the false representation concerned a material existing fact; (3) that the party relied upon the false representation; and (4) that the party was damaged as a proximate result of relying on the false representation. Cowen v. M.S. Enterprises, Inc., 642 So.2d 453 (Ala.1994). State Farm contends that no misrepresentations were made to the Hunters and that their reliance on any alleged misrepresentation was unjustified.
State Farm argues that the Receipt of Remittance form clearly notified the Hunters that the accident was not covered, but as we have previously discussed, the evidence is disputed as to what information the form contained when Renea Hunter saw it. It is undisputed that Greg Hunter never saw the form until after the Hunters had filed their lawsuit. State Farm also argues that Renea Hunter admitted that no one at Alexander’s office promised her that the accident would be covered. According to Renea Hunter’s testimony, however, neither Alexander nor McAnalley told her the accident would not be covered, and, she said, both assured her that she should not worry.
“A. ... [McAnalley] said [to Alexander,] ‘Mrs. Hunter is here to pay her premium, and Greg has also had a wreck this morning. And her premium — it is showing on *433 the computer that it was out of force.’ And she did show him on the computer.
“Q. Okay.
“A. And he hesitated a minute, and then he said, ‘Well, just ... go ahead and accept the check and treat it as if there’s coverage.’
“Q. Okay.
“A. And then I asked her, I said, ‘Now, you know, now what, what happens now?’ And she says, Well, there’s a possibility that it will have to go before a committee, but, you know, don’t worry about it,’ so I didn’t really. I tried not to.
[[Image here]]
“Q. Bill Alexander never promised you this accident would be covered?
“A. Bill Alexander assured me not to worry about it.
“Q. Well, you didn’t answer my question. He never promised you that this accident would be covered?
[[Image here]]
“A He never said T promise this accident is covered,’ no. But he assured me when I left there that I didn’t have anything to worry about.
[[Image here]]
“Q. ... [M]y question is Bill Alexander didn’t indicate that it would or would not be covered?
“A. He never looked at me and said ‘This accident is not covered.’
“Q. No, he didn’t, but he never looked at you and said ‘This accident is covered,’ did he?
“A. Right. No, right.
[[Image here]]
“Q. But he hadn’t told you anything to make you believe that [he would take care of the situation and the truck would be covered]?
“A Well, if someone looks at you who you have paid for over six years and you feel like you are Mends with the people who work in their office and that they are honest people and says ‘Don’t worry about anything, I am taking your money and we are going to treat it like you have coverage,’ would you not think that he was committing to you?”
Teresa McAnalley testified as follows:
“Q. ... Did you tell Ms. Hunter that there was definitely no coverage for this truck — this accident that morning?
“A Not as blunt as that. But all indications I gave her was there was no coverage.
“Q. Tell me what kind of indications you gave her.
“A More or less probably body language and, you know, showing her the computer, pointing to lapsed, pointing to the due date.
“Q. You wanted to tell her but you didn’t, right?
“A Not as bluntly as you have said it.”
After reviewing the record as a whole, we conclude that there is a genuine issue of material fact as to whether Alexander represented to Renea Hunter that the defendants would treat Greg Hunter’s accident as though it were covered; if made, that representation clearly was false. We conclude that there also is a genuine issue of material fact as to whether, under the circumstances, the Hunters justifiably relied upon the alleged representation. Their reb-anee would have been unjustifiable as a matter of law only if the alleged representation was “‘so patently and obviously false that [the plaintiffs] must have closed [their] eyes to avoid the discovery of the truth.’ ” Hickox v. Stover, 551 So.2d 259, 263 (Ala.1989) (quoting Southern States Ford, Inc. v. Proctor, 541 So.2d 1081, 1092 (Ala.1989)) (interpolations in Hickox ).[1] See also Ramsay Health Care, Inc. v. Follmer, 560 So.2d 746 (Ala.1990).
Viewing the evidence in the light most favorable to the Hunters, we conclude that they presented substantial evidence that created genuine issues of material fact re- *434 garding their breach of contract and fraud claims; therefore, a summary judgment in the defendants’ favor was inappropriate as to all claims except that of bad faith. The summary judgment procedure is not a substitute for a trial on disputed issues of fact, and it cannot be used to deprive a litigant of a proper trial to resolve genuine issues of material fact. Duckett v. Wilson Hotel Management Co., 669 So.2d 977 (Ala.Civ.App.1995). Because we reverse the summary judgment on all claims except the bad faith claim, we need not address the Hunters’ argument that the trial court should have granted their motion to strike certain testimony.
The summary judgment is affirmed as to the Hunters’ bad faith claim. The remainder of the judgment is reversed, and the cause is remanded for further proceedings.
The foregoing opinion was prepared by Sam A. Beatty, Retired Justice, Supreme Court of Alabama, while serving on active duty status as a judge of this court under the provisions of § 12-18-10(e), Ala.Code 1975.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
All the Judges concur.

. We note that the "justifiable reliance" holding in Hickox was overruled by our supreme court in Foremost Ins. Co. v. Parham, 693 So.2d 409 (Ala.1997). In Foremost Ins. Co., the supreme court replaced the "justifiable reliance” standard with the "reasonable reliance” standard. The new standard, however, applies only to fraud cases filed after March 14, 1997.