This appeal involves a claim of misrepresentation in the sale price of an automobile. Plaintiff, Margaret Ann Proctor, bought a new 1986 Isuzu Trooper II vehicle from Southern States Ford, Inc. (hereinafter "Southern States"), and then sued Southern States and its salesman Kevin Starcher for allegedly making misrepresentations about certain charges added to the manufacturer's "sticker price" of the new vehicle. The jury awarded Proctor compensatory damages of $1,779.00 and punitive damages of $70,000.00 against both defendants, and the trial judge entered judgment accordingly. We affirm.
The evidence tends to show the following. On August 15, 1986, Proctor visited Southern States to inquire about the purchase of an Isuzu Trooper. Salesman Starcher showed Proctor the vehicle she ultimately bought, and the manufacturer's sticker on the vehicle showed the price to be $11,966.00. Even though there should have been an addendum sticker on the vehicle's window detailing the various additional dealer charges, there was no addendum sticker on this vehicle. Because the automobile had no air-conditioner, Proctor asked that one be added. In the office, Starcher put together a worksheet on the vehicle and listed the following items on the worksheet:
"Basic Delivered Price of Unit $11,966.00 "AMV 389.00 "Protection Pkg 495.00 __________ $12,850.00 "Air Condition 895.00 __________ $13,745.00"
Proctor asked about the charge for "AMV," and she testified that Starcher told her that AMV was a fee similar to taxes, tags, and title. Starcher denied that he gave this explanation. He testified that all he told her was that AMV was "adjusted market value." Defendants acknowledge that AMV is actually an additional dealer profit or markup.
After negotiations, Proctor agreed to buy the vehicle if the charges for the protection package and the air-conditioner were taken off. At that point, she signed the worksheet. She testified that she thought that she had agreed to pay only $12,355.00 for the vehicle. The worksheet reflects that the selling price was to be $13,150.00. See Appendix A. Proctor stated that she did not believe that the figure of $13,150.00 was on the worksheet at the time she signed it, and she also said that she was never given a copy of the worksheet.
Proctor was then taken to the finance office for the preparation of the final contract. She testified that she felt rushed in executing the documents and did not examine them. The "Retail Order and Invoice" indicates a "Basic Delivered Price of Unit" of $13,150.00. Added to that unit price are charges for "Borg-Warner" ($795.00), "Sales Tax" ($160.33), "License or Transfer Fee" ($3.00), and "Invoicing and Services" ($92.00), for a total price of $14,200.33. Proctor was given a "Total Credit" for her trade-in of $2.11; this "Total Credit" was figured by adding the used car allowance of $5,862.11 plus her cash payment of $2,358.41 and then subtracting the amount Proctor still owed on her trade-in. This left an unpaid balance of $14,198.22, which was to be financed for 60 months at $326.69 per month. See Appendix B. Proctor signed the Retail Order and Invoice and the "Alabama Vehicle Retail Installment Contract," which also indicated the amount financed to be $14,198.22. Nowhere on either of these documents was there a listing of the protection package and air-conditioner charges. Proctor took the vehicle and copies of the contracts home on the date of sale.
Southern States submitted Proctor's credit application to Union Bank Trust *Page 1083 
Company, but Union Bank would not extend credit for the full amount and requested that an additional $1,500.00 of the purchase price be paid in cash rather than be financed. Southern States called Proctor and told her that she would have to pay an additional $1,500.00 in cash. She refused, and eventually Southern States agreed to guarantee to the financing institution $1,500.00 of the total amount financed.
Because of this problem with the financing, Southern States asked Proctor to come back to the dealership in order to execute a new set of contracts. Before she returned to the dealership, she had discussed the matter with an attorney friend, who counseled her not to sign any more papers. Nevertheless, on August 20, 1986, Proctor signed a new set of contracts.[1] The new documents were apparently the same as those executed previously except that the name of the financing institution was changed from Union Bank to Ford Motor Credit Company.
The defendants argue that the trial court should have directed a verdict in their favor on the basis that Proctor's reliance on the misrepresentations of the salesman was unreasonable, as a matter of law. The scintilla rule, which was applicable in this case, requires that an issue in a civil case go to the jury if the evidence, or a reasonable inference therefrom, furnishes as much as a glimmer or trace in support of an issue. Alabama Farm Bureau Mut. Cas. Ins. Co. v. Haynes,497 So.2d 82, 85 (Ala. 1986). This Court stated in NationalSecurity Fire Cas. Co. v. Vintson, 454 So.2d 942, 943-44
(Ala. 1984):
 "A directed verdict is proper only when there is a complete absence of proof on a material issue or where there are no disputed questions of fact on which reasonable people could differ. Ritch v. Waldrop, 428 So.2d 1 (Ala. 1982). When a motion for directed verdict is requested, the entire evidence must be viewed in a light most favorable to the opposing party. Ott v. Fox, 362 So.2d 836 (Ala. 1978)."
Defendants contend that there is no evidence that the plaintiff reasonably relied upon the alleged misrepresentations. Of course, reasonable reliance is a necessary element of a claim for misrepresentation.
 "Because it is the policy of courts not only to discourage fraud but also to discourage negligence and inattention to one's own interests, the right of reliance comes with a concomitant duty on the part of the plaintiffs to exercise some measure of precaution to safeguard their interests. In order to recover for misrepresentation, the plaintiffs' reliance must, therefore, have been reasonable under the circumstances. If the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover."
Torres v. State Farm Fire Cas. Co., 438 So.2d 757, 758-59
(Ala. 1983).
Defendants rely heavily on the case of Traylor v. Bell,518 So.2d 719 (Ala. 1987). In Traylor, the plaintiff alleged that an automobile dealer had defrauded him by adding the cost of a protective package to what the plaintiff understood the sale price to be. Plaintiff signed a "retail buyer's order" that contained the higher figure and that did not itemize the charge for the protective package. However, the charge for this protective package was contained in a dealer's "add-on" sticker that was on the car window. In that case, the plaintiff never read the sales documents before he signed them, because he was a poor reader and had poor eyesight. This Court held that there had been no reasonable reliance on the part of the plaintiff.
Defendants in this case strongly urge that if the uneducated plaintiff in Traylor did not reasonably rely upon the alleged misrepresentations there, then the well-educated plaintiff in this case could not be found to have reasonably relied on the misrepresentations alleged to have been made here.
Plaintiff contends otherwise. She argues that the case ofVillage Toyota Co. v. Stewart, 433 So.2d 1150 (Ala. 1983), is more *Page 1084 
analogous to the present case than is the Traylor case. InVillage Toyota, the facts were as follows:
 "The plaintiffs saw the sticker, which included a charge for TLC. They subsequently told the defendant's salesman they did not want this option; however, they did want air conditioning and a radio. The defendant then quoted a total price for the car, which should have reflected only the options the plaintiff[s] wished to purchase. There was no price breakdown given for any of these options. Therefore, under the evidence presented, the jury could have found that the plaintiffs were justified in thinking that defendant had subtracted the price of the TLC and added the price of the air conditioning and radio in arriving at the total price. Thus, the plaintiffs' reliance on the defendant's misrepresentation was reasonable under these circumstances."
433 So.2d at 1154-55.
We are of the opinion that the present case is more likeVillage Toyota than like Traylor. In Traylor, the cost of the protective package was added into the total price without the plaintiffs ever knowing about that charge at all, even though the cost of the protective package was clearly visible in an "add-on" sticker on the car. The plaintiff apparently never inquired about the protective package, and, had he examined the final price on the sales agreement or the "add-on" sticker, he would have noticed the difference due to that charge. Here, as in Village Toyota, the plaintiff did inquire about the various options and stated that she would pay for some but not for others. Also, the jury could have found that she was not given the worksheet, and neither of the contract documents contained a breakdown of which charges had been added to the price; as inVillage Toyota, in this case the jury could have found that the plaintiff was justified in thinking that the defendants had correctly subtracted the price of the protection package and the air-conditioner and added an AMV. Further, there was no "add-on" sticker itemizing the options, as there was supposed to be, and there was evidence that the defendants had lied about the AMV charge.
Here, the plaintiff testified concerning her understanding of the "deal," as follows:
"Q. What was the sticker price?
"A. Eleven, nine sixty-nine.
 "Q. If the deal that you thought that you had finally made was, you were going to pay sticker price, plus AMV?
"A. Yes, sir.
"Q. How much is AMV?
"A. Three hundred and eighty-nine dollars.
 "Q. So you thought you were paying twelve thousand three hundred and fifty-five dollars for that car?
 "A. That's the — that's the only charge that I thought was being added to the vehicle, other than the sticker price, and I only thought that was being added because it was a standard fee.
 "Q. But you understood that the deal that you had made with Mr. Starcher, was that you were going to pay for this car, twelve thousand, three hundred fifty-five dollars?
 "A. I felt — I knew I was going to pay the sticker price, plus the AMV.
 "Q. You had looked at the sticker price before you even signed the worksheet?
 "A. Uh-huh, I looked at it on the car out in the lot.
"Q. And you looked at it on the worksheet?
 "A. Right. "Q. And you looked at the AMV price on the worksheet; is that correct?
"A. Yes, sir.
 "Q. So you expected to pay twelve thousand three hundred fifty-five dollars?
 "A. I'm sure at that time I didn't add it up in my head, but I felt like that was the deal we had come to and I was going to pay that for the car.
"* * * *
 "Q. Miss Proctor, tell the jury what you thought the deal [was] that you had on August 15th, and then again on August *Page 1085 
20th, when you left? Tell me what you thought it was?
 "A. The deal that I had, and I had from Mr. Starcher, which I trusted him as a salesman, was that I was not being charged for the Protection Package, or the air conditioner, and I was charged for AMV, which I was told, when I asked him, it was for a charge similar to taxes and title.
 "Q. If you had known it was profit, would you have been willing to pay it?
 "A. No, its sort of like the protection package. The way feel about it, — I mean, it was, there was no — no, it was just profit."
The AMV charge was a part of the purchase price plaintiffpaid for the automobile, and she testified that had she been told truthfully what AMV was, she would not have paid it. An argument could be made that she should have noticed, in any event, that the $13,150 price on the document exceeded what she thought she would pay, even with the AMV added, and that she could not have reasonably relied upon the salesman's statement. We believe that the jury was authorized to find that the salesman intentionally misled her about the basis for the AMV charge; that she would not have paid the AMV charge had she known the truth; that her reliance upon the statement by the salesman was reasonable; and that she suffered detriment as a result thereof. She testified that she thought the $13,150 price represented the sticker price, plus AMV, plus an extended warranty.
Based upon the above, we conclude that there was evidence that the plaintiff reasonably relied on the alleged misrepresentations and that the trial judge properly denied the defendants' motion for a directed verdict.
Defendants also argue that the evidence was insufficient to warrant the recovery of punitive damages. If the evidence establishes an intent to deceive or defraud, then punitive damages are recoverable. American Honda Motor Co. v. Boyd,475 So.2d 835, 839 (Ala. 1985).
There was evidence presented that Southern States' agents had deliberately misrepresented not only to the plaintiff, but to others, that AMV was something other than profit, so the jury could have found the intent element.
We have carefully examined the defendants' other contentions concerning certain evidentiary rulings and find them to be without merit. Therefore, the judgment of the trial court is affirmed.
AFFIRMED.
ALMON, ADAMS and KENNEDY, JJ., concur.
HORNSBY, C.J., and JONES, SHORES and HOUSTON, JJ., concur specially.
STEAGALL, J., concurs in the result. *Page 1086 
 APPENDIX A
Editor's Note: This retail order and invoice is electronically none transferrable. *Page 1087 
 APPENDIX B
Editor's Note: This retail order and invoice is electronically none transferrable.
[1] The first set of contracts was not retained by either Proctor or Southern States.