James A. Cassell owned a house and lot in Coffee County, on which Army Aviation Center Federal Credit Union ("Credit Union") held a first mortgage. Cassell listed his house for sale with Charles J. Boland, a realtor/broker. J. Douglas Faulk signed a contract to buy the house for $189,000. The sale was not closed on the day fixed by the contract, but was delayed. Cassell went to Fort Rucker National Bank ("FRNB") and borrowed about $6,000 for living expenses pending the sale of his house. This loan was unsecured, but Cassell promised the bank in his loan application that the loan would be repaid when his house was sold. Approximately two months later, Cassell again went to the bank to borrow money for living expenses. This time, the bank insisted upon a second mortgage on Cassell's house and required a guarantor on Cassell's note. Cassell gave FRNB a second mortgage on his residence, junior to the pre-existing mortgage to the Credit Union. Cassell then signed a promisory note, dated January 5, 1989, in the amount of $18,037, secured by the second mortgage. Charles J. Boland executed the promissory note as cosigner and guarantor with Cassell.
On July 6, 1989, Boland executed another promissory note as cosignor and guarantor with Cassell; this note renewed the note of January 5, 1989. The note was renewed again on March 2, 1990, and Boland again signed the note as cosigner and guarantor; Cassell never signed that note. It is undisputed that Boland signed all three notes in question as cosigner and guarantor.
The purpose of the loan was to provide living expenses for Cassell until the loan closing on his house. The benefit Boland expected to receive was his commission from the sale of Cassell's house.
Cassell defaulted on the note and filed a petition for relief in the bankruptcy court in April 1990. FRNB then sued Boland, as cosigner and guarantor of the note. Boland answered, denying that he was indebted to FRNB, and he counterclaimed against FRNB, alleging negligence, wantonness, and fraud on the part of FRNB. He alleged that FRNB had represented to him that for payment it would look to the real estate securing the loan and would not hold him liable on the note.
FRNB filed a motion for summary judgment on its complaint and on Boland's counterclaim. The trial court granted the motion, and Boland appealed from the resulting judgment. We affirm.
Boland testified in deposition that Hilda Davis from FRNB asked him to cosign Cassell's note because Cassell had no job. Boland testified as follows:
 "Q Okay, but I mean, why did you feel any obligation or necessity or need whatsoever to help James A. Cassell by signing as a guarantor on an $18,000 loan?
 "A Well, the way that — the main reason that I signed was I guess that I was just a tool to help trigger the transaction as, you know, for the . . . for the loan."
". . . .
 "Q Okay. Now, before the bank agreed to loan this money, under this note dated January the 5th, did they require you to give any evidence of your financial condition? Did you have to provide them with a financial statement or —
 "A I think a tax return. I think I had to submit a tax return to them. I don't recall exactly, but I think it was. . . .
 "Q Okay. So, you knew from that, did you not, that they were interested in your financial condition at the time the loan was made?
 "A Well, they, you know . . . I guess they had to have some evidence that I was — that I existed as far as some income was concerned, evidence of income, because you know. . . .
"Q Okay.
 "A Because they wouldn't loan him, because he didn't have any.
". . . . *Page 597 
 "Q Okay. And they required your signature because you did have income?
"A That is correct.
 "Q And they required you to provide your income tax returns to substantiate that?
"A That is correct.
 "Q Why do you think they would require all that if they didn't expect you to be liable for the note?
 "A Well, like I just said, that somebody had to have some income, because they couldn't loan him without any income or no job.
"Q Well, what makes you think that?
"A Well, that's what I was told.
 "Q Well, what do you think the purpose of having somebody with some income to cosign the note is?
 "A Well, I thought for the accommodation of the bank so they could loan the money.
 "Q In other words, you didn't think at the time you signed this note that the reason they had you sign it was because you had income with which to pay the note in the event —
"A That is correct.
 "Q — there was a default and the collateral did not pay for it?
 "A That is correct. I did not think that I would have —
 "Q You did not think that you had any personal liability whatsoever on the note?
 "A That is correct. That's what I — that's the way I understood it."
In bold print, above his signature on all three notes, the contract stated:
 "COSIGNERS — SEE NOTICE ON REVERSE SIDE BEFORE SIGNING. CAUTION — IT IS IMPORTANT THAT YOU THOROUGHLY READ THIS CONTRACT BEFORE YOU SIGN IT.
Signature C.J. Boland"
On the reverse side of the promissory note above Boland's signature is the following:
"NOTICE TO THE COSIGNER
 "You (the cosigner) are being asked to guarantee this debt. Think carefully before you do. If the borrower doesn't pay the debt, you will have to. Be sure you can afford to pay if you have to, and that you want to accept this responsibility. "You may have to pay up to the full amount of the debt if the borrower does not pay. You may also have to pay late fees or collection costs, which increase this amount.
 "The creditor can collect this debt from you without first trying to collect from the borrower. The creditor can use the same collection methods against you that can be used against the borrower, such as suing you, garnishing your wages, etc. If this debt is ever in default, that fact may become part of your credit record.
 "This notice is not the contract that makes you liable for the debt.
"GUARANTEE
 "For good and valuable consideration received, I unconditionally guarantee the payment of the note and any amounts agreed to be paid under the terms of the security agreement. I also agree that all of the terms of the note and, to the extent applicable, the security agreement will apply to me.
"Name: C.J. Boland"
On the reverse side of each promissory note, above and to the left of Boland's signature, is the following provision:
 "OBLIGATIONS INDEPENDENT — I understand that I am obligated to pay this note even if any other person has also agreed to pay it. I agree that you may, without notice, release any of us, release or substitute any collateral, fail to perfect any security interest or otherwise impair any collateral, waive any right you may have against any of us, extend new credit to any of us, or renew or modify this note without affecting my obligation to pay the note. I also agree that I will remain obligated to pay this note even if any other person who is *Page 598 
obligated to pay this note has such obligation discharged in bankruptcy."
In its order entering the summary judgment in favor of the bank, the trial court stated:
 "This cause submitted to the Court on the Plaintiff's Motion for Summary Judgment and Defendant's reply thereto. The Court has reviewed and duly considered the pleadings, depositions, affidavits, documents, and briefs, all of which have been submitted by both parties in support of their position. Having done so, the Court finds as follows:
 "1) It is undisputed that the Defendant executed the notes in question and that as of the 22nd day of March, 1991, the total principal and interest due and owing to the Plaintiff was the sum of the $20,418.97 with interest accruing thereafter at the rate of $6. 19 per day.
 "2) That there is no genuine issue of material fact which exists as to the defenses interposed by the Defendant or as to the allegations in his Counterclaim.
 "3) The Court specifically finds as to the Defendant's allegations of fraud that, assuming the alleged misrepresentations were made, there is no evidence that the Plaintiff intended to deceive the Defendant at the time the alleged misrepresentations were made and, given the particular facts of the Defendant's knowledge, understanding, and present ability to fully comprehend the nature of the transaction and its ramifications, he could not have justifiably relied on the alleged representations because they were so patently and obviously false that he would have had to close his eyes to avoid the discovery of the truth.
 "It is therefore ORDERED, ADJUDGED, AND DECREED as follows:
 "A) That there is no genuine issue of material fact and that Plaintiff is entitled to a judgment as a matter of law. Judgment is hereby rendered in favor of the Plaintiff, Fort Rucker National Bank, and against the Defendant, Charles J. Boland, in the sum of $20,418.97 plus interest at the rate of $6.19 per day from March 22, 1991, through the date of this order.
 "B) That the law firm of Brogden Quattlebaum is entitled to a reasonable fee for its services rendered to the Plaintiff. A hearing is hereby scheduled for the 24th day Of September, 1991, 10:00 a.m., at which time the Court will receive evidence upon which it will make a determination as to the amount of the fee and other costs of collection to be awarded.
"Done and ordered this 30th day of August, 1991.
"Terry Lucas Butts "CIRCUIT JUDGE"
Pursuant to Rule 56, A.R.Civ.P., the standard of review is whether there was any genuine issue of material fact and, if not, whether FRNB was entitled to a judgment as a matter of law. In determining whether there was a genuine issue of material fact, the appellate court is limited to reviewing the factors and the evidence considered by the trial court when it entered the summary judgment. Purvis v. PPG Industries, Inc.,502 So.2d 714, 716 (Ala. 1987). After a party moving for a summary judgment has made a prima facie showing that there is no genuine issue of material fact, the burden shifts to the other party to show that there exists a genuine issue of material fact. Perry v. Mobile County, 533 So.2d 602, 604 (Ala. 1988).
Thus, the sole issue in this case is whether, based on the facts before the trial court when it granted the summary judgment motion, there was a genuine issue of material fact and, if there was not, whether FRNB was entitled to a judgment as a matter of law.
Boland claims that the summary judgment was improper, because, he claims, FRNB used fraud or misrepresentation to induce Boland's execution of the note. Boland contends that FRNB represented to him that the real estate would stand as security and that Boland would never have to pay the debt. Boland argues that the question of whether his reliance was justified is a question for the jury. *Page 599 
In Hickox v. Stover, 551 So.2d 259, 263 (Ala. 1989), this Court adopted the "justifiable reliance" standard:
 "In light of modern society's recognition of a standard of business ethics that demands that factual statements be made carefully and honestly,
 " '[r]eliance should be assessed by the following standard: A Plaintiff, given the particular facts of his knowledge, understanding, and present ability to fully comprehend the nature of the subject transaction and its ramifications, has not justifiably relied on the defendant's representation if that representation is "one so patently and obviously false that he must have closed his eyes to avoid the discovery of the truth." '
 "Southern States Ford, Inc. v. Proctor, 541 So.2d 1081, 1091-92 (Ala. 1989) (Hornsby, C.J., concurring specially)."
Boland was not justified in relying upon the alleged misrepresentation of FRNB. The alleged misrepresentation was that the real estate would secure the payment of the loan and that FRNB would not hold Boland responsible.
Boland obtained his broker's license in 1971 and has been in real estate sales since then. He has operated Boland Real Estate, as a sole proprietorship, since he obtained his license. When the loan was made on January 5, Boland was in a business relationship with Cassell: Boland had Cassell's house listed for sale. Boland had previously borrowed money from various financial institutions, and he had signed promissory notes and mortgages; he was familiar with mortgages and the purpose of mortgages. Boland cosigned and guaranteed the payment of the note, with the knowledge that the other signer, Cassell, had no job and that FRNB was looking to Boland because he had income. FRNB required Boland to provide it with copies of his income tax returns as evidence of his income. Furthermore, the terms of the contract were conspicuously printed on the face of the document; in fact, they were only a glance away from the signature line.
Assuming that the alleged misrepresentation was made by FRNB's employee, we conclude that Boland "must have closed his eyes to avoid the discovery of the truth," because the alleged misrepresentation was so contradictory to the terms and provisions of the note that a person with Boland's education and experience should have known the truth. Boland was not justified in relying on the alleged misrepresentation made by FRNB. The summary judgment in favor of FRNB is due to be affirmed.
AFFIRMED.
HORNSBY, C.J., and MADDOX, HOUSTON and KENNEDY, JJ., concur.