**In re BBL GROUP, INC., Debtor.**

**Bankruptcy No. 95–42423.**

United States Bankruptcy Court,
N.D. Alabama,
Eastern Division.

Sept. 20, 1996.

Charles Cleveland, and Lee Cleveland, of Corretti, Newsom, Cleveland, Hawkins & Cleveland, Birmingham, AL, for the debtor-in-possession.

David B. Anderson and Christian Glenos, of Walston, Stabler, Wells, Anderson, &

Bains, Birmingham, AL, for Talent Tree Staffing Services, Inc.

Ben Lofton, appearing pro se.

Robert Landry, for Bankruptcy Administrator.

### BBL ORDER OF CONFIRMATION OF FIRST AMENDED CREDITOR'S CHAPTER 11 PLAN OF REORGANIZATION

JAMES S. SLEDGE, Bankruptcy Judge.

This matter came before the Court on August 21, 1996, and on September 4, 1996, for a hearing on the First Amended Creditor's Chapter 11 Plan of Reorganization for BBL filed on May 28, 1996, by Talent Tree Personnel Services, Inc. (Talent Tree). BBL Group Inc. (BBL) filed an objection to confirmation dated August 12, 1996. Ben Lofton filed an objection to confirmation dated August 13, 1996. Talent Tree provided notice on July 19, 1996, of the hearing scheduled for August 21, 1996. The hearing began on August 21, 1996 and was concluded on September 4, 1996. Appearing before the court at each hearing were Charles Cleveland, attorney for BBL; Benjamin Lofton, *pro se*, David Anderson and Chris Glenos, attorneys for Talent Tree; Harvey Campbell, attorney for Roy and Peggy Shelton; Robert McWhorter, attorney for Charles Shepherd and Doyle Payne; and Rob Landry, for the bankruptcy administrator.

Lofton and BBL filed objections to every provision of the Plan, but they basically contend that BBL should be allowed to pursue litigation against Talent Tree in which they have asserted fraud and fraudulent transfer claims.

Under the Plan, Talent Tree proposes to reorganize BBL and to pay 100% of creditor claims other than Talent Tree. An essential feature of this Plan is the voluntary subordination by Talent Tree of claims in the BBL case in exchange for the release of claims by BBL against Talent Tree and Don Harris, former counsel for BBL.

Evidence was presented to the Court consisting of live testimony, deposition testimony, transcribed hearings and the § 341 meeting and exhibits. Vince Cook, Chief Financial Officer of Talent Tree; Roger Pugh, a real estate appraiser; Terry Humphreys, an accountant, Dr. Shelton, a secured creditor, and Benjamin Lofton each testified at the hearings. Citations in this Order are to exhibits and transcribed testimony.

### Findings of Fact

1. After a recent merger, Talent Tree Personnel Services, Inc. changed its name to Talent Tree Staffing Services, Inc.

2. BBL is a Nevada corporation established in 1989 by Lofton [Exh. 5, p. 23]. Lofton's daughters were initial incorporators [Exh. 5, pp. 63–64] and directors [Exh. 5, pp. 63–64] and his wife, Barbara Lofton, was also a director of BBL [Exh. 14, p. 159].

3. Lofton has had two years of legal training [Exh. 5, p. 58] and he has experience with personnel management. Through BBL, Lofton provided consulting services in the Washington, D.C. area [Exh. 5, pp. 24, 61–62]; however, BBL terminated its consulting business several years ago [Exh. 5, pp. 70–71].

4. In addition to a consulting business, BBL also owned two Subway Sandwich Shops in Birmingham, each being operated by one of Lofton's daughters [Exh. 4, pp. 8, 16]. Each of Lofton's daughters and Lofton's sister assisted in the maintenance and preparation of corporate and tax records for BBL [Exh. 4, pp. 27–28]. The Subway Shops failed [Exh. 4, p. 22], resulting in the priority State of Alabama tax claims and the Century Plaza final judgment for unpaid rent that were scheduled by BBL.

5. After moving to Alabama, Lofton formed two companies, Psychiatric Evaluation and Rehabilitative Services, Inc. (Hospital Consulting Company) and Loufield [Exh. 5, pp. 18–19, 122–128]. Through the Hospital Consulting Company Lofton intended to provide personnel consulting services to Psychiatric Care Day Hospital Center & Clinics (Hospital), a non-profit psychiatric day care hospital in Birmingham formed and operated by Barbara Lofton [Exh. 3, pp. 40–41; Exh. 5, pp. 126–127]. Through Loufield Lofton intended to participate in his brother's engineering business [Exh. 5, pp. 122–126]. Lof-

ton actually provided personnel consulting services to the Hospital, for which he claims not to have been compensated [Exh. 3, pp. 39–41; Exh. 5, pp. 81–82], and Lofton assisted in the maintenance and operation of the BBL Farm where he and his wife Barbara live.

6. One of the primary assets of BBL is a Maryland lottery ticket. This ticket entitles BBL to 20 annual payments of $175,000 commencing in February of 1991 [Exh. 4, pp. 75–76]. In 1992 BBL purchased a farm and cattle and equipment, all located in St. Clair County, Alabama [Exh. 5, pp. 40–42, 71]. Barbara and Benjamin Lofton moved to Alabama in late 1992 [Exh. 5, p. 71]. After the Subway Shops failed, BBL's only active business was farming [Exh. 5, pp. 23–24].

7. BBL spent the Annuity payment received in February of 1994, and Lofton enjoyed the use of Barbara Lofton's $300,000 salary being paid by Talent Tree [Exh. 3, pp. 162–163, 170–171]. This Court placed the February 1996 Annuity payment in an escrow account and approximately $90,000 remains in the account.

8. Although Lofton claimed no relationship with the Hospital, documents produced by BBL revealed that BBL borrowed money from the Hospital in 1993 [Exh. 4, pp. 149–153] when it could not afford to pay for the consulting services being rendered by Lofton to the Hospital through the Hospital Consulting Company [Exh. 3, pp. 39–41]. BBL and Lofton enjoyed the use of Barbara Lofton's salary from the Hospital [Exh. 3, pp. 162–163, 170–171].

9. Talent Tree's claim in these Bankruptcy Cases arose from payroll services it provided to the Hospital beginning in December of 1993 [Exh. 1]. The Hospital was already in operation when Talent Tree began to pay the Hospital's payroll (salaries and taxes for existing employees) and to perform the tax accounting and reporting. The employees of the Hospital were not hired by Talent Tree and Talent Tree did not establish personnel policies or supervise or control the Hospital employees. Prior to Talent Tree, other unrelated companies provided payroll services to the Hospital. It appears that Lofton assisted his wife in establishing and implementing personnel policies for the Hospital [Exh. 3, pp. 39–41; Exh. 5, pp. 81–82]. Talent Tree invoiced the Hospital weekly for the payroll services and extensions of credit.

10. In October of 1994, the FBI seized the records of the Hospital [Exh. 5, pp. 99–101] as part of an investigation of potential fraudulent claims [Exh. 5, p. 103]. The Hospital, BBL and Lofton, through Don Harris, their lawyer and the Hospital's CFO, requested Talent Tree to extend more credit while emergency relief was sought to release approximately $3,000,000 in suspended funds of the Hospital and while efforts were made to sell programs of the Hospital [Respondent's Exh. 1 from the March 20, 1996 hearing, ¶¶ 15, 16, 19, 20, 21, & 23 (hereinafter referred to as Answer and Counterclaim); Exh. 3, pp. 105–107; Exh. 13, pp. 65–73, 86]. The Hospital executed and delivered to Talent Tree a promissory note and Lofton and BBL admit that the debt due Talent Tree by the Hospital in October of 1994 was $1,048,000 [Respondent's Exhibit C from April 10, 1996 on Motion to Use Cash Collateral, etc.].

11. In order to continue extending credit, Talent Tree requested guaranties [Answer and Counterclaim ¶ 19] and desired to verify that there were funds with which to pay the debt [Exh. 3, pp. 107–108, 137–138]. Lofton provided financial data on BBL to Talent Tree to show BBL's creditworthiness [Exh. 3, pp. 137–138; Exh. 4, pp. 64–65]. Lofton knew that the BBL Annuity was involved with the extension of credit [Exh. 3, p. 138; Exh. 7, p. 30].

12. On November 21, 1994, Benjamin Lofton, as president of BBL, executed a guaranty in which BBL guaranteed the debts of the Hospital and Lofton executed a stock pledge agreement, in which Lofton pledged all of the stock of BBL to secure payment of the obligation under the note. [Exh. 3, pp. 101–102, 130–131] Lofton and his wife, Barbara, also executed guarantees for the Hospital debt [Answer and Counterclaim ¶ 21; Exh. 3, pp. 130–131; Exh. 8, pp. 18–20]. BBL pledged the annuity and its proceeds as collateral for the debts of the Hospital. Lofton and BBL knew that if the Hospital could not sell its programs or secure the release of

suspended funds, the effect of the documents submitted to Talent Tree was to require Lofton and BBL to pay the Hospital debt to Talent Tree. [Exh. 3, pp. 107–108; Exh. 10, pp. 102–107].

13. Lofton and BBL contend that Talent Tree refused to perform its agreement to extend another $500,000 in credit to the Hospital [Answer and Counterclaim ¶¶ 23, 27]. To the contrary, Talent Tree actually extended an additional $504,000 in credit to the Hospital, [Exh. 1; Exh. 13, p. 86] as agreed for a total principal amount due of $1,552,-022.84 [Exh. 1]. In order to continue the Hospital's operations BBL subsequently mortgaged the BBL Farm to Shepherd and Payne in early 1995 to obtain another $50,000 [Exh. 12, pp. 24–25; Exh. 5, pp. 95–96].

14. The efforts to release the funds through litigation and to sell the Hospital's programs failed and the Hospital terminated operations [Exh. 12, p. 29]. Talent Tree commenced a state court collection action against the Hospital (as primary obligor), Barbara Lofton (as guarantor), Benjamin Lofton (as guarantor) and BBL (as guarantor) (CV–94–09071) in which BBL and Lofton denied liability to Talent Tree and in the Answer and Counterclaim asserted claims against Talent Tree and the attorney for Lofton and BBL, Don Harris (State Court Action).

15. Barbara Lofton, a director of BBL, has claimed the Fifth Amendment privilege concerning all aspects of the transactions and relationships with Talent Tree, concerning the relationship of Lofton and BBL to the Hospital and concerning the benefits derived by Lofton and BBL from the Hospital [Exhs. 8 & 9]. Wilma Lofton, a director of BBL who had responsibility for its records and accounting [Exh. 4, pp. 25–32, 36] also claimed the Fifth Amendment [Exh. 11]. Lofton did not claim the Fifth Amendment; however, he refused to testify concerning financial transactions of the Hospital in which he and BBL and Barbara Lofton were involved in 1993 and in 1994 [Exh. 4, pp. 90–96]. Lofton also refused to provide information from which to locate his other daughter, Geniece, who also was a director of BBL and

has knowledge of its financial affairs [Exh. 4, pp. 15–18].

16. Judgments by default have been entered against the Hospital and Barbara Lofton for $1,922,064.36, which amount includes interest and fees [Exhibit 6 from March 20, 1996 Hearing on Motion for Use of Cash Collateral]. In the Answer and Counterclaim in the State Court Action Lofton and BBL admit that they each executed and submitted to Talent Tree guarantees of the Hospital debt [Answer and Counterclaim ¶¶ 21, 27]. They contend however, that Lofton was fraudulently induced to execute the security agreements, both individually and as president of BBL. Specifically, Lofton contends that Don Harris, lawyer for Lofton, BBL, Barbara Lofton and the Hospital and the CFO of the Hospital (who was also the husband of Brenda Harris, the local Talent Tree representative), convinced Lofton to execute the security agreements by assuring him that they were only personal guaranties and did not encumber any assets. [Answer and Counterclaim ¶¶ 21, 22] Lofton contends that Harris conspired with Talent Tree and was acting under the direction of Talent Tree due to Talent Tree's payrolling arrangement with the Hospital.

17. Before the State Court Action was tried, Century Plaza, a judgment creditor of BBL and Lofton, commenced this Bankruptcy Case by filing an involuntary petition under Chapter 7. BBL consented to Order for Relief and converted this case to a Chapter 11 case.

18. On May 10, 1995, the Court held a hearing in connection with the contested use of cash collateral in the BBL case. BBL in defense of the motion, failed to bear its burden of proof on the joint fraud claims, in an attempt to show no debt was owed to Talent Tree. The Court held that Talent Tree held no security interest in the Maryland annuity, based on Maryland law restricting security interests and based on the terms of the annuity. However, the Court did not hold that Talent Tree had an unsecured claim, because of the stock pledge and guaranties. The Court approved the motion to use cash collateral.

19. Throughout the hearings held in this case, it has been made apparent that the schedules in this bankruptcy case have contained several inaccurate statements. Reports required by the Bankruptcy Administrator were filed late, and only after a motion to convert was filed.

20. When the exclusive period under § 1121(b) expired Talent Tree filed its Plan. No other plan had been filed at that time. Under the Plan, Classes 3, 4, 5 and 6 are impaired and entitled to vote on the Plan. BBL, through Adversary Proceeding No. 96–40303, has objected to Talent Tree's claim under the BBL guaranty and under the Lofton stock pledge. Talent Tree has not sought allowance of these claims for purposes of voting so its acceptance of the BBL Plan as a member of Class 6 and of Class 7 will not be counted. BBL has not objected to the claims of Talent Tree assigned to it by Century Plaza. Therefore, Talent Tree is allowed to vote the claims it received from Century Plaza and its acceptance will be counted. These claims are treated under Class 6 of the plan. BBL, in its objection to confirmation, objected to Talent Tree voting at all. However, as set out above, Talent Tree is allowed to vote its claims received from Century Plaza. The BBL objection to counting the other Talent Tree vote, excluding the claim assigned to it by Century Plaza, was sustained at the confirmation hearing.

21. BBL contends that Jones, Bowron & Selden, former counsel to Lofton and BBL waived any claim against Lofton and BBL, and therefore, cannot vote to accept or reject the Plan. Jones, Bowron & Selden only offered to waive its claim against BBL if it was deemed necessary by the Court in connection with the retention of Jones, Bowron & Selden as special counsel to BBL. This waiver was not required, but, in any event, Jones, Bowron & Selden withdrew from its representation of either debtor and has not sought any fee for any services that may have been rendered. There being no objection to the claim of Jones, Bowron & Selden, it is entitled to vote to accept or reject the Plan and its acceptance will be counted.

22. Under the Plan, Class 7 consisting of the interests of Lofton, as owner of the BBL stock, and of Talent Tree, as pledgee and the holder of a stock proxy, is impaired. Lofton did not timely vote to accept or reject the Plan and Talent Tree's vote as pledgee and the holder of a proxy will not be counted because of BBL's objection. Accordingly, Class 7 did not accept the Plan. As set out above, BBL's objection to Talent Tree voting other than the Century Plaza claims, was sustained at the confirmation hearing.

23. Under the Plan the summary of ballots on impaired classes is as follows:

Class 3. The Sheltons accepted the Plan. 100% acceptance.

Class 4. Payne and Shepherd accepted the Plan. 100% acceptance.

Class 5. Jones, Bowron & Selden accepted the Plan. 100% acceptance.

Class 6. Talent Tree as assignee of the Century Plaza claim. 100% acceptance of those allowed to vote.

Class 7. No acceptances or rejections.

Since 11 U.S.C. § 1129(a)(8) has not been satisfied, confirmation of the Plan must be considered under 11 U.S.C. § 1129(b).

24. The Plan complies with the applicable provisions of title 11. 11 U.S.C. § 1129(a)(1). The Plan designates classes of claims and interests, specify which classes are not impaired, specify the treatment of impaired classes of claims and interests, provide the same treatment within classes, provide adequate means for implementation, prohibit the issuance of non-voting securities and contain other provisions that are consistent with the interests of creditors and equity security holders and with public policy concerning the manner of selecting officers and directors (of BBL).

25. Talent Tree as plan proponent under the Plan, has complied with the applicable provisions of title 11. 11 U.S.C. § 1129(a)(2). Talent Tree has obtained approval of a disclosure statement and has solicited acceptances of the Plan. No allegation has been made that Talent Tree has violated any applicable provision of title 11.

26. Talent Tree has proposed the Plan in good faith and not by any means forbidden by law. 11 U.S.C. § 1129(a)(3).

27. Evidence was presented that there are no costs or expenses in connection with the bankruptcy case, in connection with the Plan or incident to the case that are not or will not be subject to the approval of the Court. 11 U.S.C. § 1129(a)(4).

28. Mr. Vince Cook, the Chief Financial Officer of Talent Tree, will be the sole director and officer of BBL, as reorganized debtor. 11 U.S.C. § 1129(a)(5).

29. BBL presently is only engaged in the business of farming. There is no governmental regulatory commission with jurisdiction over rates charged by the debtor. 11 U.S.C. § 1129(a)(6).

30. Each holder of a claim or interest in an impaired class has accepted the Plan, except for Class 7. The below-described valuation of BBL reveals that Lofton will receive what cash and property, if any, that he would receive in a Chapter 7 liquidation. 11 U.S.C. § 1129(a)(7).

31. Class 7 has not accepted the Plan. 11 U.S.C. § 1129(a)(8). Confirmation is sought under 11 U.S.C. § 1129(b).

32. The Plan proposes the payment of allowed priority claims in accordance with 11 U.S.C. § 507(a)(8). 11 U.S.C. § 1129(a)(9).

33. Class 3, Class 4 and Class 5, each of which is impaired, have accepted the Plan. 11 U.S.C. § 1129(a)(10).

34. The Plan is feasible in that it proposes consummation by use of the BBL Annuity and the admitted equity in the BBL Farm. 11 U.S.C. § 1129(a)(11).

35. The Plan proposes to pay fees that are payable under 28 U.S.C. § 1930. 11 U.S.C. § 1129(a)(12).

36. BBL is not indebted to anyone for retiree benefits. 11 U.S.C. § 1129(a)(13).

37. Under the Plan, no holder of an interest junior to the interest of Talent Tree, as pledgee, or of Lofton as the equity security holder of BBL will receive or retain under the Plan on account of any such junior interest any property. 11 U.S.C. § 1129(b)(2)(C)(ii).

38. The assets of BBL are scheduled by Lofton under penalty of perjury as follows:

| | |
|---|---|
| BBL Farm | $410,000 |
| Cash and Deposits | $ 900 |
| Accounts | $ 20,000 |
| Annuity (15 year × $175,000/year) | $ 0 |
| Equity in Truck | $ 15,000 |
| Office Equipment | $ 7,000 |
| Machinery | $ 3,000 |
| Animals | $ 20,000 |
| Hay and Insecticide | $ 1,900 |
| Total: | $477,800 |

39. The Court heard testimony on the value of the BBL Farm. Roger Pugh, an MAI appraiser, testified that the value of the BBL Farm was $420,000 in August of 1995. Dr. Shelton, the first mortgage holder and prior owner of the BBL Farm, testified that the value was between $550,000 and $600,000. Lofton testified that the BBL Farm was worth $1,150,000.

40. The Court heard testimony from Terry Humphreys on the value of the BBL Annuity on two dates: November 21, 1994 (the date of execution of the Talent Tree loan documents); and, September 20, 1996 (the estimated effective date of the Plan). Mr. Humphreys discounted the future payments under the Annuity using a federal bond rate of 7.23% for November 21, 1994 and 6.6% for September 20, 1996. Applying hindsight the 7.23% rate was probably too high, which resulted in a lower valuation.

Mr. Humphreys was unable to determine the amount of taxes, if any, that must be deducted from the annual payments of $175,-000, because BBL had failed to produce copies of any prior tax returns and because BBL had failed to prepare tax returns for 1994 and 1995 and has not produced source documents from which these returns can be prepared and filed. Mr. Humphreys used a net annual payment of $126,875, that being the amount of the annual payments less the mandatory federal tax withholding.

After the August 21, 1996 hearing Talent Tree's counsel obtained the 1993 BBL tax return that shows a refund due BBL of $49,000 for 1993, net operating losses of $101,982 and deductions of business expenses [Exh. 19]. Mr. Humphreys testified that if the proceeds of the Annuity are used to pay business expenses of BBL, then, as reflected by the 1993 tax return, the annual payments of $175,000 should not be reduced at all. Accordingly, the annual payment of $126,875

used by Mr. Humphreys resulted in valuations that are too low. Mr. Humphreys testified that the value of the Annuity was as follows:

| | |
|---|---|
| November 21, 1994 | $1,244,637.61 |
| September 20, 1996 | $1,180,134.13 |

Mr. Vince Cook recalculated the following values:

| | |
|---|---|
| November 21, 1994 | $1,628,262.93 |
| September 20, 1996 | $1,567,854.64 |

41. A fair valuation of the assets of BBL as of November 21, 1994 (the date of execution of the Talent Tree loan documents) is as follows:

| | |
|---|---|
| BBL Farm | $ 500,000 |
| Cash and Deposits | $ 500 |
| Accounts (claim against Lofton) | $ 20,000 |
| Annuity | $1,628,262 |
| Equity in Truck | $ 0 |
| Office Equipment | $ 7,000 |
| Machinery | $ 3,000 |
| Animals | $ 20,000 |
| Hay and Supplies | $ 1,900 |
| 1993 Tax Refund | $ 49,000 |
| Total: | $2,229,662 |

42. An analysis of the debts of BBL as of November 21, 1994 is as follows:

| | |
|---|---|
| Shelton First Mortgage | $ 205,250.00 |
| State of Alabama Sales and Payroll and Ad Valorem Taxes (approximate) | $ 26,000.00 |
| Century Plaza Final Judgment Plus $4,800 in Accrued Interest and fines | $ 44,800.00 |
| Total Debts: | $ 276,050.00 |
| Total Equity: | $1,953,612.00 |

43. On November 21, 1994 the debt incurred by BBL pursuant to its guaranty of the Hospital debt to Talent Tree was $1,048,000. Thereafter, an additional $504,000 in credit was extended. Even if all of the Hospital debt is included in a solvency calculation, BBL had a net worth on November 21, 1994 of approximately $400,000. Lofton has testified that he believed that BBL could work out a repayment plan with Talent Tree if the Hospital could not pay its debt [Exh. 3, pp. 107–108; Exh. 10, pp. 102–107].

44. On September 20, 1996 the estimated effective date of the BBL Plan, a fair valuation of the assets of BBL is as follows:

| | |
|---|---|
| BBL Farm | $ 500,000 |
| Cash and Deposits | $ 98,000 |
| Accounts (claim against Lofton) | $ 0 |
| Annuity | $1,567,854 |
| Equity in Truck | $ 0 |
| Office Equipment | $ 7,000 |
| Machinery | $ 3,000 |
| Animals | $ 6,800 |
| Hay and Supplies | $ 1,900 |
| 1993 Tax Refund | $ 49,000 |
| Total: | $2,233,554 |

45. On September 20, 1996 the debts of BBL are as follows:

| | |
|---|---|
| Shelton First Mortgage | $ 155,250.00 |
| State of Alabama Sales and Payroll and Ad Valorem Taxes | $ 30,201.67 |
| Century Plaza Final Judgment and Pre-petition interest and Fees | $ 83,037.23 |
| Shepherd and Payne Second Mortgage | $ 69,853.62 |
| Administrative Expenses (as requested by Najjar Denaburg) | $ 38,439.57 |
| Claim of Talent Tree Including Pre-petition interest | $1,813,885.00 |
| Total Debts: | $2,190,667.09 |

46. As of the estimated effective date of the Plan, without including any post-petition interest or attorney's fees BBL had a positive net worth of $43,000. When post-petition interest is included, Talent Tree would have a claim of approximately $260,000, plus attorney's fees and expenses in the Lofton case that would not be paid in the BBL case. Under a liquidation under Chapter 7 Lofton would receive nothing and no one junior to Lofton is receiving or retaining any property under the BBL Plan. 11 U.S.C. § 1129(b)(2)(C)(ii).

47. All creditors in the BBL case support the compromise of claims under the BBL Plan.

48. The BBL Plan does not discriminate unfairly with respect to Lofton's interest.

49. BBL and Lofton violated this Court's discovery order of May 22, 1996 and have not produced numerous material documents that Lofton testified existed and were in his possession [Exh. 3, p. 152; Exh. 10, pp. 109–110; Exh. 5, p. 80; Exh. 4, pp. 59–64, 86–88].

50. As a result of this violation, upon findings of fact and conclusions of law stated

in the hearing held on September 11, 1996 this Court entered sanctions against BBL in the form of facts as established pursuant to Rule 7037(b)(2)(A). These facts include:

a. Benjamin Lofton was actively and intimately involved in the formation and operation of the Hospital.

b. At the time Barbara Lofton formed the Hospital she possessed no assets and no sources of income other than her $300,000 salary from the Hospital. Barbara Lofton cashed her paycheck and maintained no bank account in order to conceal assets from creditors.

c. The consulting services claimed by Lofton to have been performed for the Hospital on an informal basis only were valuable services that would have been formally compensated through the Hospital Consulting Company had the Hospital remained in operation.

d. From early 1993 until March of 1995, BBL received material financial benefit from the Hospital's revenues and extensions of credit by Talent Tree.

e. In November of 1994, when the Talent Tree loan documents were executed, the Hospital was pursuing a sale of programs and possessed claims to approximately $3,000,000 in funds that had been suspended in connection with a pending federal criminal investigation. Had the sale occurred or those funds been released, Lofton and BBL would have derived a substantial and material financial benefit in excess of the amount of Talent Tree's debt being guaranteed by BBL and Lofton.

51. In addition to the above stated facts as established, the Court further ordered that BBL would be prohibited from introducing any of the documents into evidence that they failed to produce as required by the order from this Court dated March 25, 1996.

52. Additionally, the Court ordered that BBL would be prohibited from eliciting any testimony in regard to the non-produced documents.

### Conclusions of Law

■ Talent Tree must establish the confirmation requirements by a preponderance of the evidence. *See In re Cellular Information Systems, Inc.,* 171 B.R. 926, 937 (S.D.N.Y.1994) (hereinafter *Cellular Systems* ). The BBL Plan satisfies all of the applicable requirements of 11 U.S.C. § 1129(a) except for § 1129(a)(8). The BBL Plan satisfies 11 U.S.C. § 1129(b)(2)(C)(ii).

■ Under 11 U.S.C. § 1123(b)(3)(A) a plan may provide for the settlement or adjustment of any claim belonging to the debtor or to the estate. *See Cellular Systems; see also Holywell Corp. v. Bank of New York,* 59 B.R. 340 (S.D.Fla.1986), *aff'd on other grounds,* 820 F.2d 376 (11th Cir.1987); *In the Matter of Andreuccetti,* 975 F.2d 413 (7th Cir.1992); *In re Grivas,* 105 B.R. 954 (Bkrtcy.S.D.Cal.1989); *In re Crowthers McCall Pattern, Inc.,* 120 B.R. 279 (Bkrtcy. S.D.N.Y.1990); *In the Matter of Texas Extrusion Corp.,* 844 F.2d 1142 (5th Cir.1988); *In re New Hampshire Electric Cooperative, Inc.,* 138 B.R. 668 (Bkrtcy.D.N.H.1992).

This proposition was upheld by the Supreme Court of the United States in *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968). The Supreme Court emphasized the need for a thorough examination of any proposed compromise before the bankruptcy court should approve the compromise. The Court held:

Compromises are 'a normal part of the process of reorganization.' In administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts. At the same time, however, it is essential that every important determination in reorganization proceedings receive the 'informed, independent judgment' of the bankruptcy court. The requirements of § 174 and 221(2) of Chapter X, 52 Stat. 891, 897, 11 U.S.C. § 574, 621(2), that plans of reorganization be both 'fair and equitable,' apply to compromises just as to other aspects of reorganizations. The fact that courts do not ordinarily scrutinize the merits of compromises involved in suits between individual litigants cannot affect the duty of a bankruptcy court to determine that a proposed compromise

forming part of a reorganization plan is fair and equitable. There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation. [Citations omitted]

*Id.* at 424, 88 S.Ct. at 1163.

Lofton and BBL contend in their objections, without citing any authority, that the BBL Plan cannot settle the claims of BBL against Talent Tree. In the *Cellular Systems*, § 1123(b)(3) was applied in the context of a creditor's plan proposed under circumstances where the debtor had pending a fraud lawsuit, which suit, if successful, would have eliminated the creditor's claim. *Cellular Systems* at p. 943. The Court reviewed the proposed compromise (which, as in the BBL Plan, was to satisfy a portion of the debt) under the standards of approving a compromise. *Cellular Systems* at pp. 947–948. The Court reviewed depositions taken in the fraud action; *Cellular Systems* at p. 950 fn. 51; and ruled that no trial was necessary to approve a compromise. *Cellular Systems* at 948. This was true even though the debtor claimed that the creditors were agreeing with themselves to settle the debtor's claims. *Cellular Systems* at p. 947.

The Court considered the following four factors.

1. the probability of success on the merits;
2. the difficulties that may be encountered in collection;
3. The complexity of the litigation and the attendant expense, inconvenience and delay; and

4. The "paramount" interests of creditors.

*Cellular Systems* at p. 948.

■ To determine the probability of success on the merits, the Court must examine the application of Alabama law on these facts. Under the law of Alabama, which applies to the claims of BBL, BBL has the burden of proof on their fraud claims. BBL and Lofton have offered no evidence in support of these claims except insofar as that evidence is included in the testimony and depositions offered by Talent Tree.

■ A guarantor, such as Lofton and BBL, has a duty to exercise prudence in executing documents and understanding what they contain. *Williams v. Bank of Oxford,* 523 So.2d 367 (Ala.1988). Thus, Lofton had a duty to exercise some measure of precaution to safeguard his interests and the interests of BBL when executing and understanding the Talent Tree loan documents. The general rule in Alabama is that:

[A] party who puts his signature [to a document] cannot avoid the obligations therein assumed by pleading his ignorance of its contents, unless his signature has been procured thereto by fraudulent representations of the other party or his agent as to its contents.

*State Bldg. & Loan Ass'n. v. Bradwell,* 227 Ala. 606, 609, 151 So. 689 (1933).

■ BBL contends in this action that, in violation of the duty to exercise prudence, Lofton (who knew he was making an offer to Talent Tree to repay the debt of the Hospital) declined to read the loan documents in reliance on alleged misrepresentations by counsel for BBL and Lofton, Don Harris, that the loan documents were merely "an identification of financial resources and holdings of BBL Groups to be used in making an offer to Talent Tree" [Answer and Counterclaim ¶ 40]. The agreements are each entitled "Guaranty Agreement." Lofton knew the loan documents were being sent to Talent Tree "to encourage Talent Tree to continue" extending credit to the Hospital and Lofton knew that if the Hospital did not repay the debt to Talent Tree that BBL and Lofton

would be required to work out a repayment plan with Talent Tree. There is no evidence that Lofton was prevented from reading the documents.

■ "As a matter of law, a person with the ability to read and understand the nature of the transaction, cannot rely on an oral representation when that representation is followed by an executed document that contradicts it." *Alfa Mutual Ins. Co. v. Northington,* 561 So.2d 1041, 1046 (Ala.1990). Specifically, Lofton cannot demonstrate that his reliance on the alleged misrepresentations was justified. The Alabama Supreme Court adopted the following "justifiable reliance" standard in 1989:

> A Plaintiff, given particular facts of his knowledge, understanding, and present ability to fully comprehend the nature of the subject transaction and its ramifications, has not justifiably relied on the defendant's representation if that representation is "one so patently and obviously false that he must have closed his eyes to avoid the discovery of the truth."

*Southern States Ford, Inc. v. Proctor,* 541 So.2d 1081, 1091–92 (Ala.1989).

In *Boland v. Fort Rucker Nat'l. Bank,* 599 So.2d 595, 596 (Ala.1992) the Supreme Court of Alabama concluded that a guarantor's reliance on alleged oral misrepresentations of a bank employee, that "for payment it would look to the real estate securing the loan and would not hold him liable on the note", was not justified and affirmed a summary judgment against the guarantor. In deciding that Boland's reliance on alleged misrepresentations could not be justified, the Supreme Court of Alabama considered Boland's education and experience, including the fact that he was a real estate agent, that he had borrowed money before, and that he had previously signed promissory notes and mortgages. The Court concluded:

> Assuming that the alleged misrepresentation was made by [creditor's] employee, we conclude that Boland "must have closed his eyes to avoid the discovery of the truth," because the alleged misrepresentation was so contradictory to the terms and provisions of the note that a person with Boland's education and experience should

have known the truth. Boland was not justified in relying on the alleged misrepresentation made by [creditor]. The summary judgment in favor of [creditor] is due to be affirmed.

*Id.* at 599. Likewise, any claim of reliance by Lofton, who attended law school for two years, and who had previously borrowed money and executed promissory notes and mortgages, and who claims that he was told he was guaranteeing the debt, but was not pledging collateral, cannot be justified.

In *First Nat'l. Bank of Mobile v. Horner,* 494 So.2d 419, 420–21 (Ala.1986) the Supreme Court of Alabama also held that summary judgment was due to be entered against a guarantor who contended that she relied on alleged misrepresentations of a lender to the effect that execution of the guaranty agreement was "a mere formality ... just to bring the records of the bank up to date." In holding that the guarantor's reliance was "unreasonable" as a matter of law, the Supreme Court of Alabama noted that the Horner instrument was clearly marked "Guaranty Agreement," and that there was nothing in the record to indicate that the guarantor defendant was "incapable, mentally or physically, of examining the document." *Id.* Likewise, the Talent Tree documents were clearly marked and there has been no allegation that Lofton was operating under any mental or physical disability or incapacity.

■ BBL and Lofton contend that Harris was in actuality the "employee", and therefore "agent", of Talent Tree because Talent Tree was providing payroll services to the Hospital. While this Court need not consider the agency argument, because Lofton and BBL have failed to show any material misrepresentation and because reliance was unjustified as a matter of law, Lofton and BBL were clearly aware that the Hospital employed both Harris and Barbara Lofton before Talent Tree provided any services and that salaries would cease if Talent Tree were to terminate its services. Also, Talent Tree testified that it did not have authority to control nor did Talent Tree control the Hospital's employees. Finally, it appears that Lofton, not Talent Tree, was involved in per-

sonnel decisions for the Hospital. Don Harris did not have the authority, actual or apparent, to bind Talent Tree to the alleged misrepresentations by Harris. *See, e.g., Sessions Co., Inc. v. Turner,* 493 So.2d 1387 (Ala.1986); *Roberts v. Pearce Constr. Co., Inc.,* 624 So.2d 1009 (Ala.1993).

■■■ Barbara Lofton and Wilma Lofton have each claimed the Fifth Amendment and this Court can infer that their testimony would be adverse to that of BBL and Lofton. *See, e.g., Rosebud Sioux Tribe v. A & P Steel, Inc.,* 733 F.2d 509 (8th Cir.1984) and *Brink's Inc. v. The City of New York,* 717 F.2d 700 (2d Cir.1983). Lofton too has refused to provide material information from which failure similar negative inferences can be drawn. Lofton's testimony on the existence of documents, the existence of assets, his and BBL's relationship with the Hospital, benefits derived and used by Lofton and BBL from the Hospital has been inconsistent and lacking in probative value.

■■■ BBL also claims that the BBL guaranty executed on November 21, 1994 violates 11 U.S.C. § 548(a)(2). It appears from the evidence before this Court that BBL was solvent on November 21, 1994, and for some time thereafter, until perhaps in late 1995 after BBL had granted the $65,000 Shepherd and Payne mortgage in February of 1995 to secure another extension of credit to the Hospital. Lofton believed that BBL could satisfy a repayment plan with Talent Tree if the Hospital failed. Lofton and BBL received numerous disclosed and perhaps undisclosed benefits from the Hospital; and Lofton and BBL shared an identity of interests with the Hospital and Barbara Lofton during 1994 when Talent Tree was extending credit to the Hospital. *See Mellon Bank v. Metro Communications, Inc.,* 945 F.2d 635 (3rd Cir.1991); *In re Royal Crown Bottlers of North Alabama, Inc.,* 23 B.R. 28 (Bkrtcy. N.D.Ala.1982); *In re Pembroke Development Corp.,* 124 B.R. 398 (Bkrtcy.S.D.Fla.1991); *In re Miami General Hosp., Inc.,* 124 B.R. 383 (Bkrtcy.S.D.Fla.1991). The court in *Pembroke* explained:

> In determining whether a debtor received reasonably equivalent value for an obligation incurred as part of an alleged fraud-

ulent transfer, a bankruptcy court must examine all aspects of the transaction and carefully measure the value of all benefits and burdens to the debtor, direct or indirect. [citations omitted].

> This Court recognizes that an indirect benefit to the transferor may be sufficient to establish reasonably equivalent value where the debtor and third party "are so related or situated that they share an identity of interests because what benefits one will, in such case benefit the other to some degree."

*In re Pembroke Development Corp.,* 124 B.R. 398, 400 (Bkrtcy.S.D.Fla.1991).

■■■ Applying the foregoing to the determine the probability of success on the merits, the Court concludes that BBL has little probability of success on the merits of its claims. Considering the sanctions imposed by this Court for discovery violations, the pending summary judgment motion, the documents admitted in support of confirmation, the extensive discovery in the state court suit, and the applicable Alabama law it is clear to the Court that it would be very unlikely that BBL would be successful in its fraud and fraudulent transfer claims.

The Court has heard substantial amount of evidence and testimony in this case. The Court has presided over numerous hearings within the case. Throughout these hearings, neither Lofton or BBL provided any solid evidence in support of their claims. In addition, BBL and Lofton have had substantial amount of time through the state court case and this case in which to discover any relevant information that would support their claims. Despite this time, however, both BBL and Lofton support their claims with nothing more than bare allegations and accusations. BBL and Lofton have not engaged in any discovery nor informally attempted to obtain any evidence or documents that support their claim. At the hearing on confirmation, Lofton was specifically asked whether he had any evidence to support his claim against Talent Tree in addition to his prior testimony. To this question Lofton responded in the negative. The Court can only conclude that if these matters did eventually

go to trial that BBL and Lofton would not be able to present any more evidence to support their claims than they have presented in the past. Thus, the Court believes it is in as good position to evaluate the probability of success for the debtor as if this adversary proceeding did go to trial. That evaluation leads to the conclusion that it would be very unlikely BBL would be successful in its adversary proceeding.

Applying the facts as set out to the second factor, there may be little difficulty encountered in collection. Thus, this factor is not determinative of whether to approve the compromise.

The complexity of the litigation and the attendant expense, inconvenience and delay is the third factor the Court should consider when deciding to approve a compromise. Given the fact that documents are missing, that Lofton and his family members have refused to testify and that all other material witnesses have testified, further litigation over what appear to be undisputed material facts would be expensive and would cause inconvenience and delay in the payment of creditors. The Court notes there has already been considerable expense involved with the reorganization of this debtor. If this suit were to proceed through trial, there would be sizeable additional legal expenses on the part of both the debtor and Talent Tree. In addition, there would also be a substantial delay in the reorganization of the case. Based upon prior proceedings, there is a good chance the litigation involved would prolong reorganization for many months.

The final factor to be considered as set out in *Cellular Systems* is the "paramount" interests of creditors. The Court notes that the proposed settlement is unanimously approved by creditors and that the largest creditors are represented by counsel. Finally, it appears that the only adversely affected class is Lofton's interest as equity interest holder of BBL.

 In approving the proposed compromises the Court need not try the lawsuits. *Cellular Systems* at p. 950. As in *Cellular Systems* the proposed compromise that releases BBL from a large claim is fair and reasonable and is in the best interest of creditors. This proposed release by BBL of claims against Talent Tree would be in exchange for an extremely large amount of debt ($1,100,000) to be satisfied. Thus, in exchange for a very speculative and tenuous claim by BBL against Talent Tree, BBL will receive satisfaction of over a million dollars in debt. It is very unlikely BBL would have recovered at all, much less for the amount proposed by Talent Tree. Under these facts, and the others listed above, the Court cannot help but to believe that this compromise is fair, reasonable, and in the best interest of all creditors and of BBL itself.

It should be noted, BBL had the opportunity to propose its own plan in order to resolve these issues. By law (11 U.S.C. § 1121(b)), the debtor is afforded an exclusive period in which to propose a plan. BBL did not take advantage of this exclusivity period to propose its own plan and its own settlement of these claims. The Court notes that BBL did eventually file its own plan, but this was done well into the confirmation process of the plan proposed by Talent Tree and after the exclusivity period had ended.

## ORDER

Based upon the foregoing Findings of Fact and Conclusions of Law it is hereby Ordered that:

1. The BBL Plan is confirmed.

2. The compromise of claims of BBL against Talent Tree and Don Harris proposed by the BBL Plan is approved.

3. The BBL Objection is denied.

4. The Lofton Objection is denied.

5. The alleged lease by BBL of a truck from Barbara Lofton is rejected.

6. Pursuant to Bankruptcy Rule 2002(f)(7) and 11 U.S.C. § 102(1)(B) notice of this Confirmation Order shall be provided.